IN RE TRUST CREATED BY PERCY S. ANNEKE.
FIRST & AMERICAN NATIONAL BANK OF DULUTH,
APPELLANT.
MARGARET ANNEKE PERL AND OTHERS, RESPONDENTS.[1]

June 17, 1949.

No. 34,929.

---

[1]Reported in 38 N. W. (2d) 177.

*Holmes, Mayall, Reavill & Neimeyer,* for appellant.
*Fryberger, Fulton & Boyle* and *John L. Gilmore,* for respondents.

KNUTSON, JUSTICE.

During the year 1922, Percy S. Anneke began discussions with the officers of the then First National Bank of Duluth respecting the matter of creating a living trust for the benefit of his daughter, Margaret Anneke Perl. At that time, the bank conducted a bond department and through it dealt in securities. Prior to that time, Mr. Anneke had been a regular customer of the bank and had purchased securities through its bond department. After some correspondence and discussions, a trust agreement was prepared by an attorney of Duluth who acted as counsel for the bank. Mr. Anneke was advised regarding it by his own attorney. Suggestions were made for changes in the original draft by both Mr. Anneke and his son, Victor. The agreement was finally executed on or about January 31, 1925, and it provided for payments of $500 per month to Margaret during her lifetime, the residue to go to her children, if she had any, and then to the children of Victor in the event that Margaret died without leaving children.

The trust agreement granted to the trustee broad powers in administering the trust and in investing and reinvesting funds of the trust. With respect to management, it provided:

"To hold, manage and control the Trust Estate, to sell, assign and transfer any securities or properties belonging thereto and to invest, reinvest, and keep invested, all of the corpus thereof and all additions or accruals thereto, except such as may be distributed

from time to time under the terms hereinafter set forth, in such securities or other property, real or personal, as it may, in its absolute and uncontrolled discretion, deem to be for the best interests of the Trust Estate, although the same may not be of the character permitted for investment by trustees under the Laws of Minnesota; it being the desire of the Settlor, however, that the funds of the Trust Estate shall at all times be invested in such authorized securities as aforesaid, so long as they shall yield sufficient revenue to maintain a net income to the Trust Estate of Six Thousand ($6,000.00) Dollars per annum."

The twelfth paragraph deals with compensation of the trustee, and the last sentence thereof reads:

"* * * The Trustee, in case of an investment under the provisions hereof in securities held by it, shall be entitled to the regular commission or underwriting profits of its Bond Department on the sale of such securities, in addition to the fee herein provided, with the understanding that such transactions shall always be at current market prices, and that the Trust Estate shall receive the same concessions which are allowed to investors of a like character."

In the margin of each paragraph of the agreement appear words indicating what the paragraph deals with. In the margin of the quoted portion of paragraph 12 we find: "Transactions With Bond Department of Trustee."

Paragraphs 13 and 14 deal with the liability of the trustee and read:

"Thirteenth: That the Trustee shall use its best judgment in the selection of securities for, and in the care of the properties belonging to, the Trust Estate; but that it shall not be held liable for any loss by reason of any mistakes or errors of judgment made by it in good faith, in the execution of this trust.

"Fourteenth: That the Trustee shall not be held liable for any loss arising from any action taken, or omitted to be taken, by it at the direction of the Settlor."

Mr. Anneke was in California at the time of the execution of the agreement. He died there in 1928 without ever having returned to Duluth after the execution of the agreement. Upon establishment of the trust, the trust property, consisting entirely of securities having a face value of $120,300, was turned over to the trustee by Victor. During the first seven or eight years of the administration of the trust, Victor frequently consulted with the trustee concerning investments and sometimes requested that certain securities be procured and purchased for the trust. Victor had a broad power of attorney from his father authorizing him generally to handle his father's affairs, but it did not specifically grant authority to him to represent his father or the beneficiaries in matters relating to the trust. It did contain the following authority:

"* * * upon receipt of any moneys under these presents, to deposit the same in any bank, in our name; and to withdraw the same, and to invest the same, or any part thereof, in our name or otherwise, in or upon any such investments or securities, and in such manner, as our said attorney shall think fit; * * * and to receive the dividends, interest, and income arising from our personal estate or any part thereof, and for the purposes aforesaid, or any of them, to sign our name to and execute on our behalf all checks, contracts, transfers, assignments, and instruments whatever; * * * and generally to act in relation to our estate and to the premises as fully and effectually in all respects as we ourselves could do; * * *."

During the administration of the trust, particularly during the first few years thereof, the trustee purchased, with money belonging to the trust, some securities owned by its bond department. Some of these securities had been owned only a short time. They were generally purchased slightly below par and were sold to the trust at par, resulting in a profit to the bank.

Semiannual accounts were furnished to the settlor and to the beneficiaries in accordance with the trust agreement. Such accounts showed all securities on hand. In the course of the purchase

of the securities involved, Victor was consulted, and he approved such purchases. In some cases, he requested that certain securities be procured for the trust.

The First National Bank of Duluth later was consolidated with the American Exchange National Bank and thereafter operated as First & American National Bank of Duluth. As such, it continued to act as trustee.

During the early part of 1948, the trustee filed its account of the administration of the trust from the inception thereof on January 31, 1925, to December 31, 1947. Objections to the account were filed by the life beneficiary, Margaret, and the residuary beneficiaries, who are the children of Victor. The objectors contended that the securities purchased from the bank's own bond department were unauthorized and illegal investments, and they asked that the trustee's account be surcharged with the losses resulting from the sale of such securities at less than the purchase price and with interest lost on the money so invested. The original cost of the securities so purchased was $54,597.95. They were ultimately sold for $43,428.69, resulting in a loss to the trust of $11,169.26. The trial court sustained the contention of the objectors and surcharged the trustee's account with such loss, together with interest amounting to $8,735.12, aggregating a total sum of $19,904.38. This appeal is from the order of the trial court.

No question is raised regarding the correctness of the trial court's computation. The sole question presented for our determination is whether the settlor, by his trust agreement or his subsequent dealings with the trustee, had authorized the purchase of securities owned by the trustee from itself.

The rule against self-dealing by a trustee, which prohibits both sale of the trustee's own property to the trust and purchase by the trustee of property of the trust, is so firmly established and universally accepted that it seems useless to again restate the rule here. We need only quote what we said in St. Paul Trust Co. v. Strong, 85 Minn. 1, 5, 88 N. W. 256, 257:

"The rule of law which forbids transactions whereby the personal interest of a trustee may be opposed to his duty has often been referred to and applied in this court. It was stated in Baldwin v. Allison, 4 Minn. 11 (25), that no rule is more fully settled than that which forbids a trustee's dealing with himself in respect to trust property; that no fraud, in fact, need be shown by the beneficiaries, and no excuse can be offered by the trustee to justify such transactions. The fact established, the result inevitably follows. This proposition has been repeated and affirmed in many cases. In King v. Remington, 36 Minn. 15, 25, 29 N. W. 352, 358, it was put in this form:

" 'The rule which disables one occupying a confidential or fiduciary relation in respect to property the subject of sale, from purchasing for his own benefit, and regarding him as a trustee if he do purchase, is absolute, and looks to no other facts than the relation and the purchaser.'

"In Webb v. Paxton, 36 Minn. 532, 32 N. W. 749, it was stated that the doctrine 'does not depend upon the existence of intentional fraud, but is an inflexible rule, founded upon the fact that the two employments are incompatible.' "

Applied to a corporate trustee, the rule is stated in Restatement, Trusts, § 170, p. 436, as follows:

"A corporate trustee violates its duty to the beneficiary if it purchases property for the trust from one of its departments, as where it purchases for the trust securities owned by it in its securities or banking department. A corporate trustee cannot properly purchase for the trust property owned by an affiliated or subsidiary corporation in which it has the entire interest or a controlling interest or an interest of such a substantial nature that there would be a temptation to consider its own advantage in making the sale and not to consider solely the advantage to the beneficiaries of the trust. The rule is the same where the shares of the selling corporation are owned by the shareholders of the corporate

trustee. So also, a corporate trustee cannot properly purchase property for the trust from one of its officers or directors."

The trustee does not question this rule, but contends that it is inapplicable to the facts of this case. It is the contention of the trustee that paragraph 12, read in connection with the balance of the agreement, should be construed so as to hold that the settlor had expressly conferred upon the trustee authority to purchase from itself securities which it owned. The portion of paragraph 12 relied upon principally by the trustee and the construction of which gives rise to the main dispute involved herein is that which provides: "The Trustee, in case of an investment under the provisions hereof *in securities held by it,* shall be entitled to the regular commission or underwriting profits of its Bond Department on the sale of such securities, * * *." (Italics supplied.) The trustee contends that the words "securities held by it" mean securities owned by it, and that when read in connection with the balance of the agreement and construed in the light of the circumstances and past dealings of the parties they show an intent on the part of the settlor to authorize the trustee to purchase from its bond department securities which it owned.

In Larson v. Security B. & T. Co. 178 Minn. 209, 211, 224 N. W. 235, 236, 226 N. W. 697, where we had occasion to pass upon the meaning of similar words used in G. S. 1923, § 7738, now M. S. A. 48.86,[2] we said:

"The question is raised as to whether the defendant had the right to sell and transfer these securities owned by it to the Larson estate. Under the common law this could not be done, nor could

[2]"Any amount not less than $100.00 received by any trust company as executor, administrator, guardian, or other trustee, or by order of court, not required for the purposes of such trust, or not to be accounted for within one year, it shall invest as soon as practicable in authorized securities either then held by it or specially procured by it; and the income, less its proper charges, shall become part of the trust estate, and the net accumulations thereon shall be likewise invested, accounted for, and allowed in the settlement of such trust."

it on December 13, 1901, when St. Paul Tr. Co. v. Strong, 85 Minn. 1, 9, 88 N. W. 256, was decided. In that decision the court says:

" 'Had the legislature intended to abolish the well-known and well-established rule, it would not have done so by implication, and would not have left the matter to be inferred, but, on the contrary, would have expressly provided that investments might be made by trust companies in securities *held and owned* by such companies, provided they were of the character prescribed by law.' [Italics ours.]

"At the time of this decision the statute relative to trust companies provided in substance that investments of sums over $100 in the hands of trustees should be invested as soon as practicable. L. 1899, p. 210, c. 200, § 5. The legislature, knowing of this decision, in 1903 enacted what now appears as G. S. 1923, § 7738. The suggested language found in the opinion—'held and owned'—was not followed, but 'held by it or specially procured by it' was used instead. A trust company generally owns securities of its own (as these mortgages originally were). It also holds securities as trustee which were originally turned over to it when it undertook a trust or which it had purchased by the use of trust fund money. Under the 1903 law, the defendant could have specially procured by purchase securities on the market with the Larson estate moneys, or could have purchased such securities held by it in some other trust fund. Could it buy, for that purpose, securities owned by itself? We think not. Had the legislature so intended it would have used the language of the St. Paul Trust Company case. The failure so to do shows a contrary intent. Even if the legislative intent is not manifest, statutes in derogation of the common law are to be strictly construed. St. Paul Tr. Co. v. Strong, 85 Minn. 1, 88 N. W. 256; Turner v. Fryberger, 94 Minn. 433, 103 N. W. 217, 110 A. S. R. 375; Arnold v. Smith, 121 Minn. 116, 140 N. W. 748; Congdon v. Congdon, 160 Minn. 343, 200 N. W. 76; Bandfield v. Bandfield, 117 Mich. 80, 75 N. W. 287, 40 L. R. A. 757, 72 A. S. R. 550; 39 Cyc. 366; 6 Dunnell, Minn. Dig. (2 ed.) § 8958.

"The word 'held' should be construed in the sense in which it is found elsewhere in the trust company laws. School Dist. No. 30 v. Cons. School Dist. No. 30, 151 Minn. 52, 185 N. W. 961. In G. S. 1923, § 7731, a trust company is authorized to 'hold property in trust.' This means having in possession and under control property (not its own) for others."

We again considered the same question in Kelly v. First Minneapolis Trust Co. 178 Minn. 215, 216, 226 N. W. 696, wherein, adhering to the holding in the Larson case, we said:

"* * * What did the legislature mean by the words 'then held by it'?

"A preceding section of the statute used the word 'hold,' indicating that the word did not mean ownership. G. S. 1923 (2 Mason, 1927) § 7731. True, the word may be used to indicate ownership or it may be used to indicate actual possession. Most of the property held by a trust company is held by it in trust. The trust company possesses such property; it holds it, but it does not own it. The word 'hold' has a very natural and usual reference to such property. But is the use of such word limited to such securities?

"We are now urged to hold that the legislature intended to use the word 'held' in an unrestricted sense as meaning 'owned.' There is some logic to support that contention, yet there are obstacles.

"If the legislature had so intended why did it not say so in undoubtful language? It had before it the language of this court in the Strong case as above quoted. Had it desired to do as claimed, it could easily have expressly authorized investments in securities 'held or owned' by them. It did not do that. It used only the word 'held.' "

The Larson and Kelly cases are considered in an article by Austin Wakeman Scott, *The Trustee's Duty of Loyalty*, 49 Harv. L. Rev. 543, where the author said:

"The principle that a trustee cannot properly sell his individual property to the trust is applicable to corporate trustees. A trust

company violates its duty to the beneficiaries of a trust under which it is trustee if it purchases property from itself. * * *

"It is sometimes contended that a trust company should be permitted to purchase securities for its trusts from its securities or banking department, because it is in a position to judge most wisely as to the value of such securities. If it always acted with an unbiased judgment, this might conceivably be so. But the difficulty is that it is not in a position to exercise an unbiased judgment. In a sense the difficulties are greater than those which arise in the case of an individual trustee. An honorable individual trustee can hardly help seeing the direct conflict between his own interests and his duty to the beneficiaries. On the other hand, the officers of a trust company owe allegiance to the shareholders as well as to the beneficiaries, and the temptation to favor the shareholders may well be more insidious than the temptation of an individual trustee to favor himself. It seems clear that in both cases self-dealing is too dangerous to be permitted. It has been suggested that there is no harm where the trust company sells securities to itself as trustee if it makes no profit thereby, since in that case the beneficiaries are put in a better position than if the securities were purchased from third persons who would receive a profit. One objection to selling the securities at cost is that where the trust company has underwritten the securities it has usually agreed with the other underwriters not to sell at less than the price of the public offering. Quite apart from this, however, there is the danger that the trust company may make the trust estates a dumping ground for securities left on its shelves.

"The same principle is applicable where a corporate trustee purchases property from an affiliated or subsidiary corporation in which it has the entire interest or a controlling interest or an interest of such a substantial nature that there would be a temptation to consider its own advantage in making the sale and not to consider solely the advantage to the beneficiaries of the trust."

It is true that at the time the trust agreement involved in this case was drawn the Larson and Kelly cases had not been decided.

However, St. Paul Trust Co. v. Strong, 85 Minn. 1, 88 N. W. 256, *supra,* upon which the change in the statute is no doubt based (see Kelly case), was decided in 1901. There is no longer any doubt as to the meaning of the words "held by it" in the statute. In the Kelly case, we said (178 Minn. 218, 226 N. W. 697): "If the law needs change let them who made it change it." That case was decided in 1929. The legislature has not seen fit to change the law, so we must assume that our interpretation of the words used in the statute has met with the approval of the legislature. Shall the same words in an agreement creating a trust be given a more general meaning so as to include within the meaning of the words "held by it" property owned by the trustee?

Clearly, the portion thereof relating to underwriting profits can have no relation to purchase of securities owned by the trustee. Securities sold by an underwriter are not owned by the seller. Do the words relating to *commission* on the sale of securities held by it express an intention on the part of the settlor to grant to the trustee authority to purchase from itself securities *owned* by it?

It is no doubt true that the settlor, to begin with, and the beneficiaries, either personally or through their agent, had full knowledge of the investments made and the securities purchased by the trustee. However, the record does not show that disclosure was ever made of the fact that the securities owned by the trustee had been purchased. The strongest proof of knowledge, and possible authority, is contained in letters of Victor written to the trustee. In a letter of January 17, 1930, after requesting the trustee to reserve certain named securities for the trust, he said:

"If these securities meet with your approval I will appreciate your purchasing them from the First National Duluth Company with funds which the Margaret Anneke Perl Trust will have on hand on February 1, 1930."

Again, on July 12, 1930, he wrote the trustee requesting reservation of another security, ending his letter in language identical with

the above. In answer to this letter, the trustee, on July 17, 1930, wrote Victor as follows:

"As recently authorized by you and approved by Mr. Williams, we have purchased from the First National Duluth Company for the above captioned Trust Account, * * * Bond as shown on the enclosed receipted statement, and thank you for your co-operation in the matter."

At the time these letters were written, the First National Duluth Company was a separate corporation owned by the trustee and used by it instead of its former bond department. It is conceded that insofar as the question before us is concerned it was the trustee. Many letters were written between the trustee and Victor suggesting investments and approving them after purchase. In none of these is there a suggestion that purchases were to be made of securities owned by the trustee. Even the quoted portion of the letters mentioned above *do not so indicate.* Purchase from the First National Duluth Company does not imply purchase of bonds owned by the company.

Whether Victor had authority to speak for the settlor we do not determine. It is clear that he took care of settlor's business generally and was relied upon by the beneficiaries to look after their interests.

In In re Trust Created by Watland, 211 Minn. 84, 91, 300 N. W. 195, 198, we stated the rule applicable to the construction of a trust instrument thus:

"First to be determined *is* donor's intention as expressed in the language used in the trust instrument. In that determination we are to be guided by the well known principle that the entire instrument must be considered, 'aided by the surrounding circumstances, due weight being given to all its language, with some meaning being given, if possible, to all parts, expressions and words used, discarding and disregarding no parts as meaningless, if any meaning can be given them consistently with the rest of the instrument.' Dumaine v. Dumaine, 301 Mass. 214, 218, 16 N. E. (2d) 625, 628, 118

A. L. R. 834, 839; In re Trusteeship Under Will of Ordean, 195 Minn. 120, 261 N. W. 706."

Applying this rule to the facts and circumstances presented here will not permit us to read into the instrument, by implication, a waiver of a rule of law so well established and so strictly applied as that against self-dealing by a fiduciary. This trust agreement was drawn by competent counsel. Had he intended to grant to the trustee authority to deal in securities owned by it for the trust in contravention of the well-established and strict rule against self-dealing, it would have been a simple matter for him to say so in clear and unmistakable language. Having omitted to do so, we must construe the contract strictly against a meaning that will read into the instrument, by implication, an intention to grant such authority. It is the better rule that if the settlor intends to waive the protection afforded by law against self-dealing by a trustee he must say so in clear and unmistakable language.

There is no doubt that the decision in this case places upon the trustee a difficult burden of proof. All the persons having personal knowledge of the facts involved have passed away. This, however, may also be charged against the trustee. The trustee could have filed an intermediate account and could have had it allowed by the court while the parties were living. He could have applied to the court for guidance in the purchase of these securities. Since L. 1933, c. 259, § 2, a trustee is required annually to file his account. Under § 3 (M. S. A. 501.35), the trustee may petition the court to have such account settled and allowed. Even before the enactment of this statute, trustees could have intermediate accounts allowed, and the order allowing them was binding in the absence of fraud. Wann v. Northwestern Trust Co. 120 Minn. 493, 139 N. W. 1061.

Affirmed.

MR. JUSTICE MAGNEY took no part in the consideration or decision of this case.