In the Matter of the IRREVOCABLE INTER VIVOS TRUST ESTABLISHED BY R. R. KEMSKE BY TRUST AGREEMENT DATED OCTOBER 24, 1969

and

In the Matter of the REVOCABLE INTER VIVOS TRUST ESTABLISHED BY R. R. KEMSKE BY TRUST AGREEMENT DATED OCTOBER 17, 1972

STATE BANK & TRUST COMPANY OF NEW ULM, Respondent,

v.

Carol J. MELZARK et al, Appellants,

v.

STATE BANK & TRUST COMPANY OF NEW ULM, Respondent.

Nos. 50610, 50611.

Supreme Court of Minnesota.

April 24, 1981.

Rehearing Denied June 1, 1981.

Cochrane & Bresnahan and Stewart Loper, St. Paul, for appellants.

Gislason, Dosland, Malecki, Gislason & Halverson and C. Allen Dosland, New Ulm, Fredrikson, Byron, Colborn, Bisbee & Hansen and John P. Byron and Jack Helms, Minneapolis, for respondent.

SIMONETT, Justice.

The beneficiaries of two trusts filed objections to the allowance of the trustee's accounts and petitioned for surcharge. After trial in county court, the trial judge granted relief as to the trust created in 1969 but denied the objectors' claims for the trust created in 1972. On appeal to a three-judge district court panel, the county court's order was reversed on the 1969 trust and affirmed as to the 1972 trust. We granted leave for the objectors to appeal to this court. We affirm the decision on the first trust and reverse on the second.

Rudolph Kemske, a retired New Ulm businessman, died on February 3, 1973, at age 83. In 1969 he had created a trust with State Bank and Trust Company (State Bank) as trustee. In 1972 he had created a second trust, again with State Bank as trustee. In May 1978, State Bank filed petitions for the allowance of its accounts for all years since inception of the trusts. This prompted the objections of the beneficiaries —decedent's daughter, Carol J. Melzark, and her three children.

While the parties involved are the same for both trusts, the issues raised are different, so we will discuss each trust in turn.

### The 1969 Trust

Appellants, who are the objectors, claim the district court panel improperly evaluated a corporate trustee's standard of care, a state bank's standard of care, the trustee's administration of multiple trusts and evidence of alternative investments. In addition, appellants question the trustee's "self-dealing" and management of the trust assets.

The 1969 trust was drafted by Mr. Kemske's friend and attorney, Henry Somsen. It provided for the income to be paid monthly to the settlor's daughter, Carol Melzark, but with the monthly payments to increase as principal of the trust increased. Mr. Kemske funded the trust with 10,309.-

205 shares of Common Stock Fund, a mutual fund, valued at $55,154.25.

At the time the trust was created, State Bank had just acquired trust powers; Mr. Kemske's trust was the ninth trust accepted by the bank's new trust department. State Bank, in turn, was owned by State Bond and Mortgage Company (State Bond), a company established in New Ulm since 1914 and in the business of selling certain kinds of securities.

Because one of the issues before us is self-dealing, it is important to understand the interrelationships of State Bank and State Bond. State Bond had three mutual funds known as the State Bond Group of Mutual Funds, namely, the Common Stock Fund, the Diversified Fund, and the Progress Fund, Inc. Each mutual fund had its own governing board of directors, some (but not a majority) of whom also held positions with either State Bond or State Bank. State Bond, however, acted as investment adviser and manager of the three mutual funds. In 1969, State Bond set up State Bond Sales Corporation, a wholly-owned subsidiary, to handle the marketing of the three mutual funds.

Mr. Somsen testified it was Mr. Kemske's desire to fund his trust with his Common Stock Fund shares, and he also wanted State Bank as his trustee. Mr. Kemske knew that Mr. Somsen, his lawyer, had been a director at State Bond for some 20 years and also owned stock in the company. At the suggestion of the bank's trust department, Article X was inserted in the trust instrument, expressly authorizing self-dealing by the bank as trustee, permitting both retention and acquisition of securities of the State Bond Group. Article X provided:

Trustee is expressly authorized to invest all or part of the trust estate in shares of common stock of regulated investment companies known as "The State Bond Group," or in shares of common stock of State Bond and Mortgage Company, irrespective of the fact that the corporation issuing such securities is, or may be, "affiliated persons" or "affiliated persons of affiliated persons" and have

interlocking directors and/or investment advisors. Trustor is aware that trustee is presently owned by State Bond and Mortgage Company and power to invest in it or in stocks of corporations owned or managed by it or in which it may have any interest whatever is given expressly for the purpose of averting and waiving any prohibitions upon such investment which might exist in the absence of such power.

An increasingly greater portion of the trust's assets was invested in a single stock fund as time progressed. In September 1972, Mr. Kemske transferred more shares of Common Stock Fund, worth $22,568.78, to the trust, plus $33,500 in cash. At this time Mr. Kemske also named trustee State Bank as beneficiary of a $30,000 life insurance policy. After Mr. Kemske's death on February 3, 1973, the trustee used $23,500 of the life insurance proceeds to purchase more shares of the Common Stock Fund. By then approximately 80% of the trust assets were invested in the Common Stock Fund.

As of December 31, 1976, the trustee exchanged all the Common Stock Fund shares held by the trust for shares in the Diversified Fund, which was a fixed income rather than an equity growth fund.

The gravamen of appellants' complaint is that the yields earned by the trust from 1970 to 1976 were too low, especially on the Common Stock Fund shares. There was considerable dispute at trial as to yield computations, but the trial judge arrived at these figures:

| Year | Total 1969 Trust Yield | Common Stock Fund Yield |
|------|------------------------|-------------------------|
| 1970 | 4 % | 4 % |
| 1971 | 1.8% | 1.8% |
| 1972 | 3.2% | 3.2% |
| 1973 | 7.2% | 5.5% |
| 1974 | 2.5% | 1.3% |
| 1975 | 2.5% | 1.1% |
| 1976 | 2.5% | 1.1% |

The trial judge compared these yields with what the trust monies (ranging from $101,400 to $103,000 valued at cost), if invested in 6% savings certificates, would have produced and concluded the yield

would have been $14,387 higher. The trial court then ruled that the trust had been imprudently managed and, notwithstanding Article X, the losses should be surcharged to the trustee. It was this ruling that the district court panel, one judge dissenting, reversed.

1. Appellants first contend that State Bank, as trustee, should be held to the standard of care of a corporate fiduciary, suggesting this is a higher standard than for a noncorporate fiduciary. Respondent notes that Minn.Stat. § 501.125, subd. 1 (1980), prescribes the prudent person standard without distinguishing between an individual and a corporate trustee. Since we are convinced the distinction, if any, was not a factor at trial, it need not be decided; it is an abstract question, not resting on existing facts or rights.

The only expert at the trial was Thomas Welch, called by respondent, who was head of the trust department of the Marquette National Bank of Minneapolis and who, as a corporate trustee, testified State Bank's investments were consistent with his department's policies. As respondent points out, the district court did judge the trustee's performance by professional trust department standards in view of Mr. Welch's testimony, so appellants have no cause to complain here.

2. Appellants' second argument is that State Bond, as a state chartered bank, should be held to no less a standard of care than national banks. Again appellants have no cause to protest and we reject their plea for reversal. Respondent's expert, Mr. Welch, agreed that state and national banks should be evaluated on the same standard of prudency, which is just what appellants are arguing; and respondent, in its brief, acknowledges that national and state banks, when acting as trustees, are equally governed by the common law.

Apparently what appellants have in mind is a banking circular released on December 23, 1975, by the then acting Deputy Comptroller for Trust Operations. The circular prohibited national banks from investing trust assets in mutual funds in the absence of specific authorization to do so under state legislation. It did not, however, purport to create any new prohibition but only to summarize the then existing state law as understood by the Comptroller. The Comptroller's concern was not that mutual funds were an unreliable investment but that they might constitute an improper delegation of authority by the trustee. The regulation was never formally issued and, indeed, was retracted a year later. There is no merit to appellants' argument.

■ 3. For their third issue, appellants claim the district court panel erred in assigning "some weight" to the trustee's management performance in a third trust in determining the trustee's performance with respect to the 1969 and 1972 trusts. After examining appellants' claim, we determine there is no error.

At trial, respondent State Bank attempted to counter claims of trustee mismanagement by offering to show the aggregate yields for the 1969 trust, the 1972 trust and a third trust, the Laura Kemske trust. Laura Kemske, who predeceased her husband Rudolph, had created a trust in 1951, also naming the daughter, Carol Melzark, and her children as beneficiaries. This trust had been transferred to State Bank, as trustee, in 1972.

State Bank's expert, Mr. Welch, testified it was accepted and prudent practice for a trustee to administer three trusts together, where, as here, there were common beneficiaries and common investment objectives. The trial court, however, refused to receive the investment data on the Laura Kemske trust, stating each trust had to be evaluated as a separate entity. The district court panel said the trial court was in error in not considering the three trusts as a group on the issue of prudent management.

Evidence from the Laura Kemske trust would have been relevant on the question of investment objectives, since a short-term income emphasis in the Laura Kemske trust strengthens the propriety of a long-term growth strategy in the 1969 trust. It is in this context we understand the district

court to have ruled. If yields from the Laura Kemske trust had been received to raise the low yields from the other two trusts, this would be a different matter; but such evidence was successfully kept out of the case by the appellants and, of course, was not considered by the district court.

4. Appellants next contend the district court panel erred in disregarding evidence of the rate of return on treasury bills. The argument is without merit. The trial judge contrasted the yield in treasury bills with the trustee's choice of poor-yield mutual funds. The district court panel, in considering this argument, said the trial court relied too heavily on hindsight. In other words, the district court considered the rates of return but found improper the trial court's use of hindsight in evaluating these returns.

5. The fifth issue raised by appellants concerns improper self-dealing. Respondent argues appellants have not properly raised this issue, neither in their petition to this court for review nor in their brief. While it is true the issue has not been raised directly, it is argued as a part of appellants' other issues, and we will, therefore, discuss it.

The trial court, finding that the trustee engaged in improper self-dealing, said:

The trustee advanced its interests and those of its parent company and affiliates, State Bond, Sales, and Common Stock Fund at the expense and to the detriment of the trust by retaining all Common Stock Fund shares and by purchasing additional Common Stock Fund shares during 1973 at a time when the trustee knew or should have known that such shares were not providing the income needed and expected by the terms of the trust.

The district court disagreed with this finding and held there was no improper self-dealing. We agree with the district court.

If the 1969 trust had not contained Article X, much of State Bank's investment activity would have been improper self-dealing, but Article X clearly sanctions such activity. Express authorization to deal in affiliated securities is common in trust practice and is permitted. Restatement (Second) of Trusts § 170, Comment t (1959). In *In re Trust Created by Anneke*, 229 Minn. 60, 38 N.W.2d 177 (1949), the trustee bank purchased securities from its own bond department and the bank was surcharged for the resulting loss. We reiterated the "firmly established and universally accepted" common-law rule that a trustee may not put himself in a position where his self-interest may conflict with the beneficiaries' interest. But after so holding, we went on to say that a settlor may waive the protection afforded by law against self-dealing if done in "clear and unmistakable language." *Id.*, 229 Minn. at 72, 38 N.W.2d at 183.

Here the settlor authorized State Bank to deal in the mutual fund shares of the State Bond Group, recognizing and accepting the fact the issuer of the securities and the trustee were "affiliated persons" and had "interlocking directors or investment advisers." Article X, in our opinion, is a waiver in clear and unmistakable language.

The record is clear, as the district court observes, and there was no suggestion of undue influence in obtaining the waiver. In creating the 1969 trust, Mr. Kemske was fully aware of the interlocking directorates and the relationship of the affiliates. He already held shares of the Common Stock Fund. In 1972 he added more shares of the same mutual fund to the trust and then set up a second trust with the same waiver provision. State Bond and its affiliates were staffed by local people in the community whom Mr. Kemske knew, so it is understandable that he would want to engage their services.

6. The sixth and final issue raised by appellants, and their main complaint, is that of mismanagement. Although the issue was strenuously disputed in the trial court and before the district court, appellants do not assign it here as a separate issue. They do, however, question the trustee's prudence in their overall arguments so that we believe the issue is sufficiently

raised for our consideration. Nonetheless, we conclude appellants failed to prove imprudent or negligent management.

While the settlor may expressly permit self-dealing, this does not mean the trustee is any less subject to his duty to manage the trust prudently. The trial court found the trustee was imprudent in keeping 80% of the trust funds in the shares of a single mutual fund company from 1973 to 1976, when it "knew or should have known that mutual funds were not a safe investment during such period." The trial court went on in its memorandum to take judicial notice that the early and middle 1970's "were not a good period for mutual funds generally." The trial court concluded it was imprudent for the trustee not to sell the mutual funds in the spring of 1973 and to invest the money in 6% savings certificates, and, therefore, surcharged the trustee for the difference in yields.

First of all, we agree with the district court panel that the trial court's conclusion, that it was imprudent to invest 80% of the 1969 trust funds in one company, is unsupported by the evidence. The Common Stock Fund was inherently diversified, since its portfolio consisted of common stock of a number of large, well-known companies, which respondent's expert, Mr. Welch, testified were appropriate trust investments of "fiduciary quality."

Secondly, we agree with the district court panel that the trial court was unjustified in taking judicial notice that the early and middle 1970's "were not a good period for mutual funds generally." This is not the kind of "fact" which is reasonably undisputable under Rule 201 of the Rules of Evidence.

Appellants' claim of mismanagement concerns the retention of the Common Stock Fund shares in the trust, plus the acquisition by State Bank of more Common Stock Fund shares in October 1973 with the $23,500 life insurance proceeds.

■ In judging a trustee's performance, the law is emphatic that the trustee is not to be second guessed by the infallibility of hindsight. Thus, Restatement (Second) of Trusts § 174, Comment b (1959), says:

> Whether the trustee is prudent in the doing of an act depends upon the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question.

See also, e. g., In re Trust Under Will of Comstock, 219 Minn. 325, 337, 17 N.W.2d 656, 663 (1945); In re Trusts Under Will of McCann, 212 Minn. 233, 241, 3 N.W.2d 226, 231 (1942). Also, while negligence may result in a surcharge, a mere error in judgment will not. Stark v. United States Trust Company of New York, 445 F.Supp. 670, 678 (S.D. N.Y. 1978).

Appellants attempted to make out their case by simply showing the Common Stock Fund did not do well from 1973 to 1976 and that savings certificates would have done better. Unlike respondent, appellants presented no expert testimony on the key issue, i. e., what a prudent trustee would have done at the time. Instead, appellants relied on hindsight. The only testimony on whether it was prudent to retain and acquire the Common Stock Fund shares at the times in question was by Mr. Welch. We agree with the district court majority that the trial court's findings of mismanagement cannot be sustained.

### The 1972 Trust

7. In October 1972, at the same time he made his will, Mr. Kemske created a second trust, a revocable *inter vivos* trust. He again named State Bank as trustee. The trust had the same beneficiaries as the first trust and the same express waiver for self-dealing. The will named State Bank as executor and the 1972 trust as the primary legatee of the estate.

After Mr. Kemske's death on February 3, 1973, State Bank, as executor, took over the estate, including approximately 5,300 shares of three securities—Continental Mortgage Investors Company, National Investors Corporation and Broad Street Investing Corporation. These were held in the estate for approximately 2½ years, until assigned to

State Bank, as trustee, pursuant to the final decree of distribution entered on August 27, 1975.

At the time the trustee took possession of the estate assets, the securities had suffered substantial losses. For example, all trading in Continental Mortgage had been suspended during the probate and the shares were listed at a nominal value of $1 a share. Total loss was estimated to be $25,652.

■ At trial the appellants first attempted to show State Bank, as executor, had mismanaged these securities, especially by the retention of the Continental Mortgage shares, which resulted in a loss of $17,550. The trial court, however, refused to receive any evidence of the bank's performance as executor from 1973 to 1975 because this was a probate, not a trust, matter. The executor's final account had been approved on April 27, 1975, when the final decree was issued. No appeal was taken, and the time for appeal has long since expired. Minn. Stat. § 525.712 (1980). Nor was any attempt made to vacate the probate court's order for fraud or mistake within the 2-year period provided. Minn.Stat. § 525.02 (1980).

The trial court correctly ruled, and the district court correctly affirmed, that the probate court's final decree of distribution and order approving the executor's final account were not subject to collateral attack. See In re Will of Kelly: Cole v. Hayes, 266 N.W.2d 700 (Minn.1978); Barrett v. MacDonald, 264 Minn. 560, 121 N.W.2d 165 (1963). Consequently, the trial court refused to receive evidence of the executor's handling of the securities in the estate.

In view of this ruling there was little left to the appellants' case. They were unable to show any negligence or imprudence on the part of the bank, as trustee, in its management of the assets. Certainly the bank as trustee could not be blamed for the worthless Continental Mortgage shares; these shares had been suspended on the stock market prior to the trustee's receiving them. Nor could the bank as trustee be blamed for the decline in value of the other two securities, which were securities originally purchased by the decedent and only retained by the trustee. Here, again, it would not do to judge the trustee by hindsight for retaining these securities. In re Trust Under Will of Comstock, 219 Minn. 325, 17 N.W.2d 656 (1945).

Near the end of the trial, appellants took a different tack. They offered to prove that they had never received notice of the hearing on the final account and petition for distribution; that instead State Bank, "as Trustee, being the sole legatee entitled to the residue of the above Estate," gave itself, as executor, a signed waiver of notice of hearing on the final account and a consent to the allowance of the account. The appellants then argued their claim had "nothing to do with the Estate," but was against the trustee. The trial court rejected the offer of proof.

Since it was the sole legatee, State Bank argues, under Minn.Stat. § 525.481 (1973) it was authorized to waive the hearing and consent to the proposed accounting and distribution. In any event, contends the bank, the appellants did become aware of the filing of the order allowing final account a matter of months after the order was filed.

The issue presented here, as we see it, is whether State Bank, as trustee, owed a duty to the beneficiaries of the trust to object to the executor's final account and its management of the assets in the probate estate. This is not a collateral attack on a probate court order. It is a claim of breach of a trustee's duty to its beneficiaries, not breach of an executor's duty to its legatee.

■ In its brief, State Bank states, "[T]he Trustee is aware and concedes that generally trustees do have a duty to the beneficiaries of the trust to pursue any actions which the trust rightly has against a prior trustee or executor for breach of his fiduciary duties." See Restatement (Second) of Trusts § 177 (1959); Scott on Trusts § 177. The fact that a bank serves in a dual capacity, and as trustee may have to question its own conduct as executor, does not alter the trustee's duty to its beneficiaries.

Respondent contends, however, the trustee's duty to question the acts of its predecessor fiduciary must be subject to a standard of reasonableness; that at best the claim against the executor here is speculative, and a trustee is not only to be excused but is under a duty not to pursue every conceivable claim. To allow claims against testamentary trustees who also serve as executors, argues respondent, in effect permits indirect collateral attacks. Finally, respondent argues, the executor's final account has been approved by the probate court, which should be proof there is no duty to seek redress.

We do not think, however, the claim here can be so summarily dismissed. Since the trial court refused to receive evidence on the claim, there is no way of knowing its merits. With respect to the Continental Mortgage loss, at least, more may be involved than a hindsight complaint, since the stock dropped from $17,550 to nothing while being held by the executor.

In a somewhat similar situation, beneficiaries have been permitted to assert a claim against their trustee. In *In re First National Bank*, 37 Ohio St.2d 60, 307 N.E.2d 23 (1974), the Ohio Supreme Court held that a bank as trustee had a duty, in accepting estate property from itself as executor, to take action to recover monies mistakenly paid on inheritance taxes. The court held the beneficiary's failure to object to the executor's final account did not preclude her from challenging the trustee's subsequent accounting.

Under Article II of the trust, the trustee undertook the duties to "collect, receive, receipt for and manage" the property of the trust. At the hearing on the final account, the trustee—acting for the trust beneficiaries—owed the beneficiaries a duty to use reasonable care and diligence in examining that accounting and objecting thereto if reasonable and prudent to do so. We pass no judgment on the validity of the appellants' claim here but only say that on the showing made it was error not to have permitted appellants, despite their last-second raising of the issue, to introduce evidence of the executor's performance as bearing on the trustee's duty of care.

We affirm the district court's decision on the 1969 trust. We reverse its decision on the 1972 trust and remand to the trial court for further proceedings consistent with this opinion.

Affirmed in part and reversed in part.

YETKA, Justice (concurring in part and dissenting in part).

I concur in that portion of the majority opinion that remands for trial and reverses the district court decision with respect to the 1972 trust.

I dissent in that portion of the opinion that affirms the district court's decision to reverse the county court's finding that the bank's trust department was responsible to the trust beneficiaries for self-dealing as to the 1969 trust.

Whenever an attorney or trustee drafts a trust instrument in which an existing or potential conflict of interest is acknowledged and in which the settlor purports to waive that conflict, there should be clear and convincing evidence that the settlor clearly understands what that conflict could mean not only in terms of the risk of investment, but also in terms of cost.

The language of the waiver provision in Article X of the trust may well be legally accurate in delineating what the settlor was purporting to waive in this case. I do not believe, however, that the language of Article X constitutes a waiver in "clear and unmistakable language" as required by the *Anneke* decision cited by the majority. 229 Minn. at 72, 38 N.W.2d at 183. The language of Article X does not, in my opinion, meet that standard because it did not go far enough in informing the settlor of some of the important consequences that resulted from his waiver.

With antenuptial agreements, both spouses must clearly understand the nature and extent of all rights they purport to waive in the contract before such waiver will be given effect. *See Gartner v. Gartner*, 246 Minn. 319, 74 N.W.2d 809 (1956); Minn.

Stat. § 519.11 (1980). The requirement that wills be witnessed and acknowledged also illustrates the public interest in assuring that a party does not dispose of property without full knowledge of how such property will be distributed. *See* Minn.Stat. § 524.2–502 (1980). The same kind of public interest is evidenced in dispositions of property made through the establishment of trusts. The same kind of assurances that such dispositions be made only with the full knowledge of the party establishing the trust should, therefore, also be present.

When there is an existing or potential conflict of interest, it is not too much to require that the trustee draft an instrument that clearly explains the nature and extent of the conflict and the financial benefit that may accrue to the trustee as a result of the conflict. In this case, it would have been possible, even by separate letter signed and acknowledged by the settlor, to identify briefly and clearly the potential conflicts, to give an indication of how the trustee would benefit from investments with affiliated entities, and to indicate the anticipated extent to which trust funds would be invested with affiliated entities. I do not think that such a disclosure would be unreasonable or unduly burdensome to the trustee or the drafting attorney.

The financial benefits to the trustee from the two trusts, whether arising directly from the administration of the trust or indirectly from investments with affiliated concerns, must have been significant. Given such benefits, this case is particularly illustrative of the need for a full and clear disclosure of a trustee's existing or potential conflicts.

I would remand for a new trial with respect to the 1972 trust and affirm the county court's finding that a surcharge was appropriate with respect to the 1969 trust.