**In the Matter of the RUTH EASTON FUND, a Separate Fund of the Edelstein Family Foundation Trust.**

No. A03–1365.

Court of Appeals of Minnesota.

June 1, 2004.

Michael V. Ciresi, David P. Pinto, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for appellant Ordway Center for Performing Arts.

Eric J. Magnuson, Gregory M. Weyandt, Marlo Weber Turcotte, Rider Bennett, LLP, Minneapolis, MN, for respondent Thomas A. Keller, III, et al.

Considered and decided by LANSING, Presiding Judge; PETERSON, Judge; and HUSPENI, Judge.*

* Retired judge of the Minnesota Court of Ap- peals, serving by appointment pursuant to

## OPINION

LANSING, Judge.

The Ordway Center for the Performing Arts (Ordway) appeals the district court's order suspending distributions to Ordway from the Ruth Easton Fund, a segregated charitable fund within the Edelstein Family Foundation Trust, and authorizing the trustees to distribute funds instead to other charitable organizations. We conclude that the district court acted within its discretion by confirming the trustees' suspension of distributions based on its finding, supported by the record, that Ordway curtailed its program for the development of new works. But because the conditions enumerated in Easton's will for redirection of funds did not occur, we reverse the district court's order authorizing the trustees to pay income and discretionary principal to an alternative charitable organization under Minn.Stat. § 501B.31 (2002).

## FACTS

This litigation involves a dispute over the distribution of income and principal from a charitable fund created by Ruth Easton. Easton was a Broadway actress who was born and raised in Minnesota. Although she retired from the stage in the late 1930's, she maintained an active interest in the theater, particularly in the production of new theatrical works.

Easton had a testamentary power of appointment over the Ruth Easton Trust, which had been created by her brother, Jacob E. Edelstein, in his 1945 will. In 1997 her longtime attorney and advisor, Thomas E. Keller III, introduced her to Kevin McCollum, then Chief Executive Officer of the Ordway, for the purpose of discussing a charitable gift. The Ordway board of directors had recently adopted a strategic plan including a stated goal of

"establish[ing] leadership in producing and presenting new musical theater independently and in local and national partnerships." The plan defined a "new work" as a "[p]iece of theater that has never been produced or seen by an audience before. It may be based on an existing book, an original concept or idea, or it could be the adaptation of an existing play into a musical."

As part of this "new work" program, the Ordway joined with the 5th Avenue Musical Theater in Seattle and the Theatre Under The Stars in Houston to form a research-and-development consortium, New Musicals/Studio USA. *Hot Shoe Shuffle* was the only show developed by this consortium that was produced at the Ordway. Ordway produced a different category of theatrical works, referred to as Ordway Originals, which were not necessarily new works as defined in the Ordway strategic plan.

After meeting with McCollum, Easton agreed to support the creation of new works at the Ordway with funding from the Ruth Easton Trust. During negotiations over the structure and terms of this funding, Keller wrote Ordway representatives describing Easton's frustrations in attempting to effectuate the purposes for which she had made a previous gift to another charitable organization. In one letter discussing the proposed Ordway gift, Keller enclosed a Wall Street Journal article that recommended a policy of designated restrictions on charitable gifts.

Easton, by codicil to her will dated September 26, 1997, created a segregated fund within the Edelstein Family Foundation for the balance of assets remaining in the Ruth Easton Trust. Easton exercised her power of appointment over the trust, in-

structing the named trustees, Keller and U.S. Bank, to pay the net income at least annually, and principal in the trustees' discretion, to Ordway in accordance with the agreement between Easton and Ordway bearing the same date. The codicil further provided that "[i]n the event that said agreement with Ordway shall have been terminated and not replaced with any subsequent agreement governing the same subject, or Ordway shall no longer be in operation, the Trustees . . . shall pay" such amounts of income and/or principal to other charitable organizations as they determine, in their discretion, to comport with her intent.

On the same day, Easton executed an agreement with Ordway. The agreement provided that she would leave binding instructions to the trustees of the foundation to hold the Easton fund as a segregated fund within the foundation "to be used exclusively to produce new full length theatrical productions" or for other purposes as approved by the trustees from time to time. The distribution of funds was to "be made . . . not less frequently than annually." The trustees "reserve[d] the right to limit or suspend (temporarily or permanently) gifts to the Ordway Easton fund . . . if," among other stated conditions, "the Ordway curtails its program to mount new productions or if the Ordway ceases to mount new productions altogether. . . ." When Ruth Easton died in 1998, the Easton fund was worth approximately $6 million.

The Easton fund contributed annually to Ordway from 1998–2002, distributing total gifts of approximately $1.1 million. Under the funding procedure in place, Ordway would propose a project for Easton funding, and Keller would exercise his discretion as trustee to determine whether the proposed project fit the definition of "new work" to qualify for Easton funding. He rejected a funding proposal if it appeared to be "mostly derivative of a prior work." Applying this standard, Keller approved distributions of about $367,000 for a production of *Adventures in Love*, $200,000 for *Ten Years Apart*, and $337,000 for *The Prince and the Pauper*. He rejected, however, proposals for productions of *Romeo and Juliet* and *South Pacific*. The Easton fund did not contribute to every new Ordway production, and Ordway also received other funding for new works, such as a Dayton–Hudson–funded program called Ordworks, which produced a workshop reading with three Minnesota artists.

In September 1999, Ordway requested information from Keller about the process of interpreting the agreement with Easton. Keller wrote back that only the agreement governed the terms and Ordway must refer to that written agreement.

In 2001 McCollum approached Keller about Easton funding for *Plaid Tidings*, a musical revue derived from *Forever Plaid* that had originally been produced at the Pasadena Playhouse. Keller declined to distribute Easton funds for *Plaid Tidings* and expressed concern to McCollum that Ordway was not financially committed to the program for new works. Keller also declined Ordway's proposal for Easton funding for *8–Track, the Sounds of the '70's*, a revue of music from the 1970's that had premiered at the Milwaukee Repertory Theater and had an eighteen-week run in Detroit before it was produced at Ordway.

McCollum left Ordway as CEO in 2002; Ordway reorganized with David Galligan as the new president and CEO. Galligan, the former chief operating officer of the Walker Art Center, did not have direct theater experience equivalent to McCollum's, and he had no experience developing new, full-length theatrical productions. McCollum maintained contact with Ord-

way as artistic advisor but had no formal contract that defined the relationship.

In August 2002 Galligan wrote to Keller requesting Easton money to cover a loss of $284,926.54 sustained by the Easton-funded Ordway production of *The Prince and the Pauper.* Keller responded that, as a result of McCollum's departure, the program needed fixing, that it would take time to find superior leadership, and that Easton money for the production deficit would be made only in recognition of McCollum's leadership. In early September the Easton fund contributed $250,000 to Ordway in recognition of McCollum's tenure and efforts.

A month after the honorary contribution, Keller notified Ordway that the Easton fund was suspending its gifts to Ordway under the terms of the 1997 agreement. Keller stated that "[w]ith Kevin's departure the program to mount new full length theatrical productions was, by that fact, curtailed," and that ["t]he purpose of the Easton gifts was not to create a program," but instead to lend support to an existing program. In a follow-up letter to Galligan, Keller expressed his doubts about Ordway's commitment to funding new work and pointed to the lack of a well-staffed program dedicated to new works and the absence of a financial commitment. U.S. Bank, as co-trustee, agreed with Keller's decision to suspend funding.

Keller contacted the Children's Theatre, an organization that maintained an active program to produce new theatrical works, as a possible substitute recipient of Easton funding. When Ordway learned of this contact, the Vice Chair of Ordway's board of directors notified Keller of Ordway's position that the trustees had no power to make gifts from the Easton fund to a charitable beneficiary other than Ordway.

Keller and U.S. Bank petitioned the district court to confirm their suspension of distributions to Ordway and to authorize them to distribute net income and discretionary principal to charitable organizations that they determined to be in accordance with Easton's intentions of producing new, full-length theatrical works. The trustees asserted that Ordway had curtailed its program for developing new works but did not assert that the agreement with Ordway had been terminated. Ordway opposed the petition on the ground that it had not curtailed its program for the production of new works, that compliance with Easton's intent remained practicable, and that the trustees had abused their discretion in suspending distributions.

A probate court referee conducted a hearing on the petition in June 2003. At the hearing, Ordway presented testimony through Galligan that both *Plaid Tidings* and *8–Track* qualified as new works. Galligan also testified that several new projects were currently under discussion, including a proposed joint project with Penumbra Theater and a production of *The Grapes of Wrath* commissioned by the Minnesota Opera and the Utah Opera. Galligan acknowledged that a reading program that sometimes led to a possible production had been dropped and that Ordway currently had no new works in workshop. Galligan attributed the absence of new works on the current schedule to the lack of Easton funding. Ordway's vice president of marketing and programming confirmed that Ordway was facing financial difficulties unrelated to the Easton fund and had laid off the equivalent of ten employees in the five months before the hearing.

The probate court referee issued findings, conclusions, and an order, affirmed by the district court, granting the trustees'

petition. Relying on the definition of "new work" in Ordway's strategic plan, the referee found that "Ordway ha[d] curtailed its program to develop new productions." The conclusions of law stated that under the agreement between Ordway and Easton the trustees were justified in not making payments to Ordway. The court authorized payments to other charitable organizations that the trustees determined in their discretion to comport with Easton's intentions. This appeal followed.

## ISSUES

I. Did the district court abuse its discretion in confirming the trustees' decision to suspend Easton fund distributions on the stated ground that Ordway had curtailed its program to develop new theatrical works?

II. Did the district court abuse its discretion by authorizing the trustees to distribute the net income and discretionary principal to "other charitable organizations that they determine in their discretion to be in accordance with the donor's intentions?"

## ANALYSIS

We review a district court's exercise of its equitable jurisdiction over a charitable trust under an abuse-of-discretion standard. *In re Trust Created by Hill,* 509 N.W.2d 168, 172 (Minn.App.1993), *review denied* (Minn. Feb. 1, 1994). A decision that is arbitrary, capricious, or not in conformity with law is an abuse of discretion. *Plunkett v. Lampert,* 231 Minn. 484, 492, 43 N.W.2d 489, 494 (1950). Factual issues embedded in a discretionary determination are reviewed for clear error. *Toombs v. Daniels,* 361 N.W.2d 801, 805 (Minn.1985); *see also* Minn. R. Civ. P. 52.01 (reciting clear-error standard). And legal issues, including the construction of unambiguous written documents, are reviewed de novo. *In re Trust Created by Hill,* 499 N.W.2d 475, 482 (Minn.App.1993), *review denied* (Minn. July 15, 1993).

### I

Ordway presents the dispute over the interpretation of the September 1997 agreement between Easton and Ordway as a contract dispute, subject to principles of contract interpretation. The trustees argue that the agreement was testamentary in nature and must be construed as a testamentary instrument.

 The agreement between Easton and Ordway was incorporated by reference into Easton's will. The incorporation permits the construction of the agreement together with the codicil executed on the same date to determine Easton's intent in setting standards for the suspension of funding to Ordway. *See* Restatement (Third) of Property, Wills and other Donative Transfers § 3.6 cmt. h (1999) ("[a] writing that is incorporated into a will by reference is treated as part of the will for purposes of distribution, construction, and administration of the estate …"). Minn. Stat. § 524.2–510 (2002) provides that "[a]ny writing in existence when a will is executed may be incorporated by reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification." For purposes of the doctrine of incorporation by reference, a will is considered executed on the date that the last codicil to the will is executed, and a writing dated on or before the day the will was executed is "presumed to have been in existence when the will was executed." Restatement (Third) of Property, Wills and other Donative Transfers § 3.6 cmt. b (1999).

The codicil to Easton's will and the agreement with Ordway were executed on

the same day. Because the documents bear the same date, the agreement is presumed to have been in existence when the will was executed. The codicil specifically refers to the Ordway agreement that created the segregated Easton fund and provides that the trustees pay the net income and, in their discretion, the principal of the segregated assets to Ordway "in accordance with [Easton's] agreement with Ordway effective on or about September 29, 1997, or any subsequent agreement [Easton] shall make with Ordway governing the same subject." Thus, the codicil sufficiently describes the agreement and confirms Easton's intent to incorporate it into her will. The prerequisites for incorporating the agreement by reference are met; we conclude that the agreement with Ordway was incorporated into Easton's will.

■■■ In light of the incorporation, the creation of the Easton fund under the codicil to Easton's will essentially created a testamentary trust. *See Bush v. Crowther (In re Bush's Trust)*, 249 Minn.36, 43, 81 N.W.2d 615, 620 (Minn. 1957) (affirming creation of trust when document designated trustee's enforceable duties, designated beneficiary's enforceable rights, and identified definite trust res). The guiding principle in construing a testamentary trust is to "give effect to the testator's intent as expressed in the plain language of the will." *In re Kischel*, 299 N.W.2d 920, 923 (Minn.1980). To discern the testator's intent, the trust instrument is read as a whole, "aided by surrounding circumstances, due weight being given to all its language, with some meaning being given, if possible, to all parts, expressions, and words used." *In re Anneke's Trust*, 229 Minn. 60, 71, 38 N.W.2d 177, 183 (1949) (quotation omitted).

The plain language of the Ordway agreement provided that the monies of the Easton fund be used "exclusively to produce new full length theatrical productions" and that the trustees reserved the right "to limit or suspend (temporarily or permanently) gifts to the Ordway . . . in the event that . . . the Ordway curtails its program to mount new productions." The meaning of "new works" was expressly defined in Ordway's strategic plan, which had been adopted during McCollum's tenure only a few months before Easton executed the codicil and the incorporated agreement. The strategic plan, which included a goal of developing "leadership in producing and presenting new musical theater," defined a "new work" as one that had "never been produced or seen by an audience before." In testimony at the probate hearing, Keller used a similar definition for a new work, describing it as a theatrical production that was not "mostly derivative of a prior work."

Ordway contends that it was only McCollum's departure as CEO that caused the trustees to suspend distributions and that this departure, by itself, did not provide a basis to determine that the program for new works had been curtailed. But the record reflects that it was not solely McCollum's departure that precipitated the suspension of funds by the Easton trustees. The new CEO did not have comparable direct theater experience or comparable experience in producing new works. Keller protested that a lack of experienced leadership would weaken the program, writing to Galligan that "[i]t is obvious that a program of the level which existed in 1997 cannot be maintained without the leadership of a person of experience comparable to Kevin's. . . . The purpose of the Easton gifts was not to create a program, but to lend some support to a program which already existed in full-blown form."

■■ Ordway also demonstrated a shift away from producing new works within the

definition of its strategic plan. During an economically challenging period, Ordway requested Easton funding for two previously produced works with demonstrated audience success, *8–Track* and *Plaid Tidings*. Testimony showed that while Ordway had some possible new works in the early stages of discussion, none had been placed on the theater's upcoming schedule. Workshops and reading programs had been cut back or eliminated. The record contains adequate evidence to support the district court's finding that Ordway had curtailed its program for producing new works within the meaning designated in its strategic plan, and it was that meaning that provided a foundation for Easton's agreement with Ordway as incorporated in her will.

■ Easton's agreement with Ordway provided that, once it was determined that Ordway had curtailed its program for producing new works, the trustees retained discretion to suspend Easton fund distributions. The trustees' decision to suspend funding is subject to an abuse-of-discretion standard. *See In re Trusts A & B of Divine,* 672 N.W.2d 912, 919–20 (Minn. App.2001) (adopting trustee abuse-of-discretion factors, including discretionary power conferred by trust terms; trust's purposes; nature of trustees' power and motives in exercising that power; existence and terms of external standards for judging trustees' conduct; and any trustee conflicts of interest with beneficiaries).

■ A trustee may not exercise its discretion in a manner that defeats the trustor's intent or the purpose of the trust. *United States v. O'Shaughnessy,* 517 N.W.2d 574, 577 (Minn.1994). But "[s]o long as the trustees act in good faith, from proper motives, and within the bounds of reasonable judgment, the court will not interfere with their decisions." *Id.* (citation omitted). The evidence demonstrates that the trustees acted reasonably and in good faith, in conformance with Easton's intent, in suspending distributions from the fund. The district court did not abuse its discretion in issuing an order confirming their decision.

## II

■ The Easton trustees petitioned for authorization to make distributions to charities that they believed fit Easton's charitable intent without regard to restrictions in the codicil or agreement designating Ordway as the beneficiary. In petitioning for this authorization, the trustees relied on Minn.Stat. § 501B.31 (2002), the legislative expression in Minnesota of the doctrine of cy pres. Cy pres is an equitable doctrine designed to preserve, as nearly as possible, the general equitable intent expressed in a charitable gift when strict accomplishment of the terms of the gift has become impracticable, inexpedient, or impossible. This common law doctrine was legislatively enacted in Minnesota in 1927 to allow courts the power to approximate the donor's intention when the exact intention, for some reason, may not be carried out. *See Lundquist v. First Evangelical Lutheran Church (In re Estate of Lundquist ),* 193 Minn. 474, 479–80, 259 N.W. 9, 11 (1935) (citing Mason's Minn. St.1927, §§ 8090–1 to 8090–4 and recognizing lengthy history of equitable cy pres doctrine).

■ The current statute allows the interpretation of a trust to "accomplish the general purposes of the instrument and the object and intention of the donor ... free from any specific restriction" contained in the trust, if "circumstances have so changed since the execution of the instrument creating the trust as to render impracticable, inexpedient, or impossible a literal compliance with the terms of the instrument." Minn.Stat. § 501B.31, subd.

2. After a hearing, the district court may fashion an order that it considers appropriate. Minn.Stat. § 501B.21 (2002). An order is "appropriate" if it is legally justified. *In re Trust Created by Hormel*, 504 N.W.2d 505, 512 (Minn.App.1993), *review denied* (Minn. Oct. 19, 1993).

■■■■■ An appellate court will not reverse a district court's decision to modify a trust absent an abuse of discretion. *In re Trust Created by Hill*, 509 N.W.2d at 172. But the district court has no authority to modify trust provisions if there is not a compelling reason for modification. *See id.* at 172–73 (holding that district court exceeded its authority by allowing amendment of foundation's articles of incorporation when no evidence of changed circumstances made compliance with existing articles impracticable, inexpedient, or impossible). A prerequisite to the application of the doctrine of cy pres is the determination that it is currently impracticable, inexpedient, or impossible to carry out the settlor's intentions without modifying the trust instrument. In construing Easton's testamentary documents, the district court summarily concluded, without accompanying findings, that the trustees could make payments to alternative charitable organizations that they determined would comport with Easton's intent.

■■■■ The plain language of the codicil to Easton's will provides that the trustees shall pay the income or principal from Easton fund assets to other charitable organizations "[i]n the event that said agreement with Ordway shall have been terminated and not replaced with any subsequent agreement on the same subject, or Ordway shall no longer be in operation." It is undisputed that neither of these conditions occurred: Ordway is still in operation, and the agreement with Ordway has not been terminated. The unambiguous language of the codicil authorizes the redirection of funds only on the occurrence of one of two stated conditions, neither of which has been met.

■■■ Even if we determined that the language of the codicil is ambiguous, we would reach the same conclusion by applying external canons of contract construction. Under the doctrine of *expressio unius est exclusio alterius*, meaning "the expression of one thing implies the exclusion of all not expressed," we attach significance to the differences in the provisions. We may presume that Easton's failure to authorize the redirection of funds if Ordway curtailed its program for the development of new works, in contradistinction to authorizing redirection if the agreement were terminated or Ordway were no longer in existence, implies that Easton intended stricter standards for the redirection of funds to another charitable organization. *See Anderson v. Twin City Rapid Transit Co.*, 250 Minn. 167, 175, 84 N.W.2d 593, 599 (1957) (applying doctrine to construction of a contract); *see also Colangelo v. Norwest Mortgage, Inc.*, 598 N.W.2d 14, 17–18 (Minn.App.1999) (discussing doctrine in context of mortgage), *review denied* (Minn. Oct. 21, 1999).

Because Easton's testamentary documents provided that the trustees could limit or suspend funds for Ordway's failure to produce new works and could select an alternative charitable organization for fund distributions on termination of the agreement or Ordway's cessation of operation, we are unable to discern a basis for the district court's summary conclusion that the trustees are now justified in making payments to other charitable organizations. The record does not support a determination that literal compliance with the terms of the instrument is impracticable, impossible, or inexpedient and that therefore the redirection of payments is necessary under Minn.Stat. § 501B.31.

*See, e.g., Sister Elizabeth Kenny Found., Inc. v. Nat'l Found. (In re Application of Sister Elizabeth Kenny Found., Inc.)*, 267 Minn. 352, 362, 126 N.W.2d 640, 646 (1964) (concluding that district court did not abuse its discretion in refusing to permit foundation, which hoped to benefit from cy pres doctrine, to intervene in proceeding to modify charitable trust when record indicated that original beneficiary was presently able to comply with terms of trust).

 The cy pres doctrine is appropriately applied only when reasonable efforts to comply with the literal language of the trust have failed. *See, e.g., Museum of Fine Arts v. Beland*, 432 Mass. 540, 735 N.E.2d 1248, 1252 (2000) (holding that doctrine of cy pres did not apply to allow museum to sell paintings bequeathed to charitable trust, absent showing that trustees had made reasonable efforts to exhibit paintings and that the efforts were futile). Keller, in an October 2002 letter to Ordway, expressed his intention to continue to fund the Ordway new-works program if it was re-instituted at its previous level. Thus, the evidence presented did not establish either that the agreement with Ordway had been terminated or that efforts could not be made in the future to support Easton's intent to fund the production of new works at Ordway.

At the same time, we recognize that tying up funds intended for charitable purposes based on a "thin thread of a theoretically possible (but unlikely) change in circumstances" serves no purpose, least of all the donor's. *Wesley United Methodist Church v. Harvard College*, 366 Mass. 247, 316 N.E.2d 620, 624 (1974). The Easton trustees reasonably point to Easton's requirement for annual fund distributions as a clear indication that Easton intended the money to be used promptly, not accumulated. The record in this proceeding, however, discloses no evidence of insurmountable problems that prevent the trustees at this point from operating within the provisions of Easton's testamentary documents. We cannot foretell whether those circumstances will change through the passage of time or because of other exigencies. *See* IVA Austin W. Scott and William F. Fratcher, *The Law of Trusts* § 399.4 (4th ed.1989) (observing that "[t]he public interest is not promoted by the creation of a charity that by the lapse of time ceases to be useful"); *see also Hormel*, 504 N.W.2d at 510 (holding that collateral estoppel applies to litigation of settlor's intent but does not preclude future challenges to application of intent on changed facts or legal circumstances).

 Any order providing for the redirection of funds, however, must be supported by specific findings and evidence. To properly invoke the cy pres doctrine, the record should establish that the trustees are carrying out the essential purpose of the donor while preserving as far as reasonably practicable the details of her original framework. "The primary function of the court in exercising jurisdiction over trusts is to preserve them and to secure their administration according to their terms. Just as the court lacks power to remake a will, it also lacks the power to remake a trust." *Northwestern Nat'l Bank of Minneapolis v. Balch (In re Cosgrave's Will)*, 225 Minn. 443, 466, 31 N.W.2d 20, 33 (1948). Easton chose language that recited differing standards for the suspension of payments and for the redirection of those payments. Neither the record nor the district court findings provide a basis for concluding that literal compliance with the terms of the instrument was impracticable, inexpedient, or impossible. Consequently the district court exceeded its discretion in allowing

the trustees to pay distributions to an alternative charitable organization.

## DECISION

The district court acted within its discretion by confirming the Easton fund trustees' suspension of distributions to Ordway on the stated ground, recited in the Ordway agreement, that Ordway had curtailed its program to mount new theatrical productions. But the cy pres doctrine embodied in Minn.Stat. § 501B.31 (2002) does not provide authority for the trustees to redistribute funds to an alternative charitable organization because they have not demonstrated circumstances that make literal compliance with the terms of the trust impracticable, impossible, or inexpedient.

**Affirmed in part and reversed in part.**