STATE OF MINNESOTA

IN SUPREME COURT

A22-0906

Court of Appeals                                                      Chutich, J.
                                                Took no part, Procaccini, J.

In the Matter of the Otto Bremer Trust.               Filed: February 7, 2024
                                                      Office of Appellate Courts

_____

Andrew D. Parker, Alec J. Beck, Parker Daniels Kibort LLC, Minneapolis, Minnesota, for appellant Brian Lipschultz.

Keith Ellison, Attorney General, James W. Canaday, Deputy Attorney General, Carol R. Washington, Assistant Attorney General, Collin R. Ballou, Assistant Attorney General, Paul Dimick, Assistant Attorney General, Saint Paul, Minnesota, for respondent State of Minnesota.

_____

S Y L L A B U S

1.      Under Minnesota Statutes section 501C.0706(b)(1) (2022), a district court may remove a trustee for a "serious breach of trust," which may involve a series of smaller breaches, none of which alone would justify removal, but which do justify removal when considered together.

2.      The district court did not abuse its discretion when it removed a trustee of the Otto Bremer Trust under Minnesota Statutes section 501C.0706(b)(1).

Affirmed.

1

OPINION

CHUTICH, Justice.

This case requires us to determine: (1) whether the district applied the correct legal standard to remove a trustee; and (2) whether the district court abused its discretion when it removed appellant Brian Lipschultz as a trustee from the Otto Bremer Trust (the Trust). In August 2020, the Minnesota Attorney General, the primary regulator of Minnesota charitable trusts, filed a petition seeking permanent removal of the three trustees of the Trust. Following a 20-day bench trial, the district court issued a 103-page order removing Lipschultz but not the other two trustees. The court found that Lipschultz had committed a series of breaches that "collectively constitute[d] a serious breach of trust that justif[ied] removal under Minn. Stat. § 501C.0706(b)(1)" (2022). The court concluded that removing Lipschultz was also justified under Minnesota Statutes section 501C.0706(b)(3) (2022).[1] The court of appeals affirmed the district court's decision, concluding that the district court did not abuse its discretion when it removed Lipschultz as a trustee under either section 501C.0706(b)(1) or (3).

Because we conclude that the district court applied the correct legal standard when removing Lipschultz under section 501C.0706(b)(1) and did not abuse its discretion when it applied that standard to Lipschultz, we affirm the decision of the court of appeals on that ground and have no need to analyze Lipschultz's removal under section 501C.0706(b)(3).

---

[1] This section allows removal if "the court determines that removal of the trustee best serves the interests of the beneficiaries because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively." Minn. Stat. § 501C.0706(b)(3).

2

## FACTS

This case began when the Minnesota Attorney General, acting under the authority conferred by the Supervision of Charitable Trusts and Trustees Act, the Trust Code, and the common law, petitioned the district court seeking removal of the three trustees of the Otto Bremer Trust. The trustees subject to the State's removal petition were Charlotte Johnson, Daniel Reardon, and appellant Brian Lipschultz. After a 20-day bench trial, which included the introduction of over 500 exhibits and testimony from more than two dozen witnesses, the district court made extensive findings of fact and removed only trustee Lipschultz. The court of appeals affirmed, and no party challenged the district court's factual findings on appeal to us. Accordingly, we draw from the district court's findings in recounting the relevant factual background.

**History of the Otto Bremer Trust**

Created by Otto Bremer in 1944, the Trust is a charitable trust that is governed by a trust instrument (the Trust Instrument). Bremer originally funded the Trust with shares of common stock from the financial institution he founded, now known as Bremer Financial Corporation (the Bank). The Bank is a privately held corporation which operates as a regional financial institution through its wholly owned subsidiary, Bremer Bank. After his death, Bremer's remaining ownership interest in the Bank was transferred to the Trust to be used for charitable purposes. Most of the value of the Trust, which at the time of the bench trial was over $2 billion, consists of its ownership of the Bank's stock.

The Trust has no named beneficiaries, but the Trust Instrument identifies specific charitable purposes that Otto Bremer desired to fund, including relieving poverty,

3

promoting good citizenship, and supporting education. Since 1944, the Trust has granted more than $800 million to organizations in Minnesota, Wisconsin, North Dakota, and Montana to further the Trust's charitable purposes; it has a large philanthropic presence in these states.

During his lifetime, Otto Bremer personally appointed certain trustees, including Samuel Lipschultz. The Trust Instrument sets forth a method for selecting successor trustees, which gives a current trustee the right to appoint their own successor. Appellant Brian Lipschultz was appointed as a trustee in 2012 by his father, who had been appointed by *his* father, Otto Bremer's appointee Samuel Lipschultz.

**Lipschultz's self-dealing**

The use of the Trust estate or income for any non-charitable purpose is prohibited by the Trust Instrument.[2] Notwithstanding this prohibition, Lipschultz used Trust staff and resources for personal purposes.

Lipschultz admitted to using Trust resources for non-Trust purposes "probably from the day [he] arrived at the Otto Bremer Trust" in 2012. Specifically, he improperly used staff time, and mailing and computer resources. Lipschultz's assistant, employed by the Trust, estimated that, between 2016 and 2019, she spent 1 to 2 hours per day of her time

---

[2]     The Trust's personnel policies, which apply to trustees, forbid the "use of office resources for non-office purposes" and bar any employee from using Trust "time or resources to pursue outside activities, (e.g., coursework or other employment)."

4

performing non-Trust tasks for him.[3] Lipschultz himself used the Trust's address to register his own personal business with the Minnesota Secretary of State and listed the Trust's address on the "About Us" web page of the business.

Staff members brought concerns about Lipschultz's use of Trust assets to the attention of the Trust's controller around September 2019. Once the controller discovered Lipschultz's misuse of Trust assets, the Trust worked with an accounting firm to calculate the value of Lipschultz's misuse from 2017 to 2019. The firm calculated the value to be $1,875, and Lipschultz reimbursed the Trust that amount. The Trust then filed amended forms for those years with the IRS and incurred a tax on self-dealing. Because the Trust could only amend its IRS forms for that time period, the value of Lipschultz's misuse before 2017 was not calculated, and he did not pay the Trust for any misuse that occurred from 2012 to 2017. The value of Lipschultz's own time spent on non-Trust matters was not calculated. Lipschultz also did not reimburse the $4,762.80 that the Trust paid for the accounting firm and legal fees associated with remediating the self-dealing for the 3 years examined.

**Conflict over the sale of the Bank's stock**

In February 2019, executives from the Bank began exploring a potential "merger-of-equals" opportunity for the Bank with another company. In April 2019, an investment bank retained to evaluate the Bank's strategic opportunities presented its analysis to the

---

[3] These personal tasks included entering his children's sporting events and travel plans on his personal calendar, scanning documents for Lipschultz's business associates, and receiving and sending mail for Lipschultz's own business, for which the Trust paid.

Bank's board.[4]  The investment bank presented four potential options:  (1) continue with the status quo; (2) go public through an initial public offering; (3) pursue a merger; or (4) explore a sale of the Bank.  During these strategic discussions, independent valuations were done that nearly doubled the fair market value that the Trust had reported in its 2018 IRS filings.[5]  The trustees were interested in selling the Bank, which could yield "hundreds of millions of dollars more for the Trust than the merger."  The other members of the Bank's board were opposed to selling.

In July 2019, the trustees concluded that it was necessary and proper to sell the Trust's shares in the Bank.  Given the new fair market value appraisals of the Bank, the Trust's IRS-mandated charitable distribution would increase substantially, and the trustees were concerned that the Bank would be unable to provide sufficient dividends to the Trust to enable it to meet the IRS requirements.[6]  Lipschultz believed the trustees had an "absolute crisis" on their hands.

---

[4]    In April 2019, the trustees held three of the ten seats on the Bank's board.

[5]    The Trust had reported the Bank's fair market value to be $899 million in its 2018 IRS filings.  One investment bank valued the Bank at $1.632 billion, while another valued it at $1.845 billion.

[6]    The Tax Reform Act of 1969 requires private foundations to determine the fair market value of their assets each year and distribute at least 5 percent of that value in qualifying distributions within a 2-year rolling period.  26 U.S.C. §§ 4942(a), (e)(1).  To meet the Trust's charitable distribution requirement, the Bank's articles of incorporation provide that the Bank must issue annual dividends to its shareholders equal to at least 5 percent of its net book value.

Tensions rose between the trustees and the other board members of the Bank, culminating in an August 2019 meeting when the board voted to terminate any further discussion regarding a sales transaction. The three trustees opposed the motion. Because the Bank had become hostile to the idea of a sale and the trustees believed that they needed to sell the Bank to protect the Trust, Lipschultz developed a plan to try to replace the current Bank board with pro-sale members by selling enough of the Trust's Bank shares to allow the trustees to have the majority voting power.[7]

On October 25, 2019, the trustees sold 725,000 of its Bank shares—or 7 percent of the Trust's holdings in the Bank—to 11 separate buyers. After the sale, the Bank refused to register the shares to the buyers. Then, on November 19, 2019, the Bank sued the trustees over the sale. *Bremer Fin. Corp., et. al. v. Lipschultz et. al.*, Court File No. 62-CV-19-8203.

Although the tensions surrounding the trustees' decision to sell stock provide context for some of Lipschultz's actions, the district court did not base its removal on the trustees' decision to pursue the partial sale, and the court declined to determine whether the partial sale was proper. The court focused its removal analysis instead on "the inappropriate behavior of Trustee Lipschultz in his communications during the transaction."

---

[7] The Tax Reform Act of 1969 also prohibits private foundations from holding more than 20 percent of the voting stock of for-profit businesses. 26 U.S.C. § 4943(c)(2)(A)(i). Following the passage of the Act, the Bank reorganized. After the reorganization, the Trust continued to own 92 percent of the Bank but possessed only 20 percent voting control. As the district court noted, the reorganization plan allowed "a third-party to whom the Trust transfers shares to convert those [nonvoting] shares to [voting] shares."

The district court found that during the stock sale dispute Lipschultz "displayed a crude, vulgar, and otherwise offensive brashness that has no place in the charitable world." When seeking buyers, Lipschultz wanted investors who were willing to incur the risks associated with a hostile takeover. He told a consultant that he wanted investors who "live for this kind of thing," because selling to them would signal to the Bank that "we aren't f-cking around." The consultant later told Lipschultz, "You told me don't bring me friendlies . . . bring me real investors" that "only care about making money and are willing to do whatever is necessary." Johnson, Lipschultz's co-trustee, did not share his enthusiasm for the plan. Because of Johnson's hesitancy, Lipschultz sent several text messages disparaging Johnson to the consultant.[8]

After the board refused to recognize the sale of stock, Lipschultz texted the consultant: "I am frightened for [the Bank] if they try to withhold shares from the new investors. I picture an aerial bombardment, the likes of which sleepy St. Paul has never seen." He then texted: "I am looking forward to observing the carnage." Regarding the suspected length of litigation, Lipschultz commented: "The truth is [the Trust] can weather this storm for a long time. I've got years of reserves if absolutely necessary." By years of reserves, Lipschultz was referencing the Trust's assets that were available to fund litigation.

---

[8] In reference to someone suggesting that Johnson should hand over her trustee seat, Lipschultz responded, "That would be great. She could give it to the panhandler on the street in front of the office and even that would be better." Two days before the sale, Lipschultz texted the consultant: "Every day I have to go through this sh-t with [Johnson], my exit price goes up."

Lipschultz also expressed frustration that some investors did not sue the Bank. He commented that one investor was a "big talker when [they] met," but "now he's not doing sh-t." Lipschultz further stated that he assumed "these investors were aggressive animals that would swoop in and go for the [Bank's] jugular without any coordination required." Lipschultz also stated that the initials of one of the investor companies, "FJ," refers to "F-ck Jeanne" Crain, the CEO of the Bank at the time.

**Interactions between Lipschultz and Junior Achievement**

Lipschultz's frustrations regarding the Bank and the trustee removal litigation informed two interactions that he had with the CEO of one of the Trust's grantees, Junior Achievement. The Trust awarded grants to Junior Achievement in previous years, including $1 million in 2017 and a 5-year $500,000 program-investment loan. The Trust was Junior Achievement's largest donor, and its grants comprised roughly 10 percent of Junior Achievement's annual revenue.

In a November 2020 call, Lipschultz expressed frustration that Junior Achievement had not stood by the trustees during their legal challenges from the Bank and the Attorney General's Office. Lipschultz told the CEO that the Trust "expected that Junior Achievement would have gone to the governor or the attorney general" to tell them that the legal activity was "government overreach." The CEO, whose testimony the district court found "compelling and credible," understood this statement as a request to lobby the Attorney General's Office on the trustees' behalf and believed that Trust funding may be in jeopardy if the nonprofit did not follow through. Lipschultz shared that the Trust was not interested in funding Junior Achievement moving forward and encouraged the CEO to

9

go back to Junior Achievement's board and determine how it could prove its support to the Trust. Lipschultz then warned the CEO that the trustees "would be in power for a very long time."

After the November 2020 call, the CEO emailed Lipschultz attempting to show Junior Achievement's support of the Trust. Junior Achievement then submitted a 3-year renewal request for a $1.2 million grant. In July 2021, that request was approved. The new grant, however, was delayed compared to previous years, and Junior Achievement missed nearly a full fiscal year of funding. This delay occurred during the height of the COVID-19 pandemic, which had impacted other revenue streams and forced Junior Achievement to reduce its workforce by 40 percent to save costs.

A second phone conversation—which the district court found troubling—occurred in August 2021, approximately 1 month before the trustee-removal trial began. During that call, Lipschultz expressed anger and frustration that Junior Achievement intended to honor the chair of the Bank board at an upcoming event. He said the award was a "catastrophic situation" for the trustees because of the timing of the upcoming trial. Lipschultz told the CEO that she "needed to figure out how to fix the situation" and that Junior Achievement's decision to honor the Bank's board chair "would damage our relationship moving forward." The CEO testified that by "our relationship" she believed that Lipschultz was referring to the relationship between Junior Achievement and the Trust. She testified that Lipschultz did not threaten her or ask that the $1.2 million grant be returned. The CEO did testify, however, that Lipschultz made her feel "disrespected and

bullied" and that he treated her "more poorly tha[n] I've been treated by a donor in my professional career."

Following her call with Lipschultz, the CEO met with Junior Achievement's Executive Committee to discuss the call. The Executive Committee instructed her to cease solo discussions with Lipschultz to protect her from "very difficult, very hostile conversations." Later, the full Junior Achievement board voted to return the $1.2 million recently funded grant from the Trust and sever its relationship with the Trust.[9] Junior Achievement's board sent the Trust a letter, stating, "Moving forward, we do not believe a continued relationship aligns with either organization's expectations. Therefore we are returning your recent grant award of $1.2MM with this letter." The CEO testified that "their expectations were at odds because Lipschultz wanted to influence Junior Achievement through the Trust's grants and treat Junior Achievement's staff poorly."

**Disclosure of Lipschultz's successor**

The district court also found that Lipschultz breached the duty of information. In May 2018, Lipschultz named his first cousin as his successor in the event he could no longer serve as a trustee. As part of its investigation, the Attorney General's Office asked Lipschultz on numerous occasions to identify all persons he had appointed or would appoint to serve as his successor. Lipschultz responded that he had not appointed a successor, when in fact he had. Then, a few weeks before trial and in support of a motion,

---

[9]     The day before Junior Achievement's board voted to return the $1.2 million grant, the CEO spoke with the Bank's CEO Jeanne Crain. The CEO admitted that Crain "elevated" and "escalated" the situation. Junior Achievement ultimately received $1.2 million from the Bank in Paycheck Protection Program loans.

11

the trustees' counsel submitted an affidavit stating that Lipschultz had appointed a successor. Counsel attached a copy of Lipschultz's successor form but redacted the successor's name. The Attorney General's Office repeatedly requested that Lipschultz identify his named successor, but Lipschultz refused to do so. Lipschultz claims that his refusal to provide an unredacted copy of his successor appointment was because of concerns over how the publicity might have affected his named successor. Lipschultz first revealed the identity of his successor while on the stand at trial.

**District Court Order**

In August 2020, the Attorney General filed a petition seeking to remove the trustees. The district court concluded that Lipschultz should be removed as a trustee. It identified Minnesota Statutes section 501C.0706 as providing the relevant removal standards, specifically sections 501C.0706(b)(1) and (3).[10]

The district court found that Lipschultz committed "a concerning series of breaches . . . that collectively constitute a serious breach of trust" and justified removal under section 501C.0706(b)(1). The district court also referenced these "repeated improprieties" to conclude that removal "best serves the interests of the beneficiaries and the Trust," citing section 501C.0706(b)(3).

---

[10] Under Minnesota Statutes section 501C.0706(a) (2022), a petition for removal of a trustee may be brought by "[t]he settlor, a cotrustee, or a beneficiary." And under Minnesota Statutes section 501C.0110(d) (2022), "[t]he attorney general of this state has the rights of a qualified beneficiary with respect to a charitable trust having its principal place of administration in this state," as the district court recognized in its order.

12

The district court relied on four specific instances of misconduct to justify removal. It first found that "Lipschultz's deception and unwillingness to disclose his appointed successor is a violation of the duty of information, and thereby a breach of trust." The court next concluded that "Lipschultz breached the duty of loyalty and violated the Charitable Trust Act by appropriating Trust assets and staff time for his own benefit, unrelated to the Trust's activities." Third, the district court determined that Lipschultz breached the duty of "loyalty to the organization by putting his own frustration, aggression, and personal interest in revenge ahead of the important interests of the Trust" when making disparaging and offensive remarks during the stock dispute. Finally, the district court found that Lipschultz committed a "serious breach of the duty of loyalty" by his "egregious misconduct" with grantee Junior Achievement because he "misuse[d] grantmaking power to further his own personal objectives and resentment" which caused the grantee to return a large grant and sever its relationship with the Trust. Cumulatively, the district court found that these breaches amounted to a serious breach.

**Court of Appeals decision**

The court of appeals affirmed the district court's decision, concluding that the district court did not abuse its discretion by removing Lipschultz under sections 501C.0706(b)(1) and (3). *In re Otto Bremer Tr.*, 984 N.W.2d 888, 902 (Minn. App. 2023). The court of appeals determined that the district court did not abuse its discretion when it found that Lipschultz breached the duty of loyalty by his self-dealing, his offensive and disparaging behavior during the stock transaction, and his abuse of grantmaking power with Junior Achievement. *Id.* at 898-900. The court of appeals also concluded that the

13

district court did not abuse its discretion in finding that Lipschultz breached the duty of information when he failed to disclose his successor. *Id.* at 901. The court of appeals held that the record supported the district court's decision that Lipschultz "engaged in a series of breaches, and those breaches when viewed collectively constitute a serious breach of trust." *Id.*

## ANALYSIS

Lipschultz first contends that the district court and court of appeals applied an incorrect legal standard regarding removal of a trustee. The correct legal standard to remove a trustee under the Minnesota Trust Code presents a question of law, which this court reviews de novo. *Woolsey v. Woolsey*, 975 N.W.2d 502, 506 (Minn. 2022). Lipschultz next contends that the court of appeals erred in determining that the district court did not abuse its discretion when it removed Lipschultz under Minnesota Statutes sections 501C.0706(b)(1) and (3). The "determination of what constitutes sufficient grounds for the removal of a trustee is within the discretion of the [district] court." *Will of Gershcow*, 261 N.W.2d. 335, 338 (Minn. 1977). Accordingly, the decision whether to remove a trustee is reviewed on an abuse of discretion standard. *Id.* We address each part of this analysis in turn. Because the statutory removal grounds are separate and independent, and we conclude that the district court did not abuse its discretion in removing

14

Lipschultz under section 501C.0706(b)(1), we need not analyze Lipschultz's removal under section 501C.0706(b)(3).

I.

Lipschultz was removed as a trustee under Minnesota Statutes section 501C.0706(b)(1), which states: "The court may remove a trustee if . . . the trustee has committed a serious breach of trust." Because the term "serious breach of trust" is not defined within the statute or generally in the Minnesota Trust Code, we may look for guidance to the official comments to the Uniform Trust Code. *In re Trust of Moreland*, 993 N.W.2d 80, 88 n.6 (Minn. 2023) (acknowledging that official comments to the Uniform Trust Code are not binding but may be persuasive).

Section 501C.0706(b), governing removal of a trustee, uses nearly identical language to section 706 of the Uniform Trust Code. *Compare* Minn. Stat. § 501C.0706, *with* Unif. Tr. Code § 706 (Unif. L. Comm'n 2023).[11] The comments to Uniform Trust Code section 706 provide that "[a] serious breach of trust may consist of a single act that causes significant harm or involves flagrant misconduct" or "a series of smaller breaches, none of which individually justify removal when considered alone, but which do so when considered together." Unif. Tr. Code § 706 cmt. The district court removed Lipschultz under the comment's second definition of "serious breach," finding that Lipschultz should

---

[11]    In 2015, the Legislature amended the Minnesota Trust Code to incorporate many provisions of the Uniform Trust Code. *See* 2015 Minn. Laws ch. 5, art. 16, § 3 at 110. The Uniform Trust Code was originally promulgated in 2000 and most recently amended in 2018, with comments most recently updated in 2020 and 2023. Section 706 of the Uniform Trust Code has not been amended since the Legislature's enactment of Minnesota Statutes section 501C.706 in 2015.

15

be removed because he committed "a concerning series of breaches . . . that collectively constitute a serious breach of trust." The court of appeals affirmed on the same basis.

Although both parties agree that the Uniform Trust Code standard and the comment that explains the term "serious breach" apply here, Lipschultz argues that the district court nevertheless erred in applying the removal standard. He contends that the district court erred by (1) not considering the settlor's intent; (2) not divining a "general rule" defining a "serious" breach of trust; (3) using a new "no place in the charitable world standard" in assessing his behavior; and (4) not applying the heightened standard of removal that Lipschultz alleges amendments made to the Minnesota Trust Code in 2015 established. We disagree.

Lipschultz correctly states that "[t]he court will less readily remove a trustee named by the settlor than one appointed by a court." Restatement (Third) of Trusts § 37 cmt. f; *Will of Gershcow*, 261 N.W.2d at 338. But Lipschultz was appointed by his own father— not by settlor Otto Bremer. Lipschultz is the third generation of his family to serve as a trustee for the Trust; the district court found, however, that "furthering Trustees' family legacies is not a Trust purpose."

Moreover, although courts give deference to a settlor's intent, this dispute is about a trustee's alleged *breach* of trust—which cannot have been the settlor's intent. Minnesota Statutes section 501C.0105(b)(2) states that "the duty of a trustee to act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries" cannot be superseded by a trust instrument. Consequently, the intent of the settlor does not prevent a court from removing a trustee for breaching fiduciary duties. Accordingly, the

16

district court did not erroneously apply section 501C.0706(b)(1) by not considering the settlor's intent that Lipschultz be a trustee.

Next, Lipschultz contends that our court might "divine a general rule" from this court's previous trust cases defining a "serious" breach of trust as one that works "material and substantive harm" on the trust. There is, however, no compelling reason why we should "divine a general rule" when we can simply apply the persuasive comments of the Uniform Trust Code to determine whether a series of smaller breaches, when considered together, amount to a serious breach. We see no need to deviate from the instructive comments of the Code and ignore its second definition of a serious breach.

Lipschultz also suggests that the district court created, and the court of appeals affirmed, a new "no place in the charitable world" standard for removing a trustee. We reject this argument. He cites one statement that the district court made about Lipschultz's behavior during the sale of stock: "Lipschultz displayed a crude, vulgar and otherwise offensive brashness that has no place in the charitable world." But nothing in the district court's order suggests that the "no place in the charitable world" language was a standard that the court was applying, rather than merely a description of Lipschultz's behavior. *See Vernon J. Rockler & Co., Inc. v. Glickman, Isenberg, Lurie & Co.*, 273 N.W.2d 647, 650 (Minn. 1978) (rejecting appellant's argument that the district court applied the wrong legal standard: "The trial court's finding . . . was merely another way to discuss" the proper standard). The district court and the court of appeals correctly stated and applied the standard for removal of a trustee, citing section 501C.0706(b)(1) and the commentary to the Uniform Trust Code. *Otto Bremer Tr.*, 984 N.W.2d at 901.

17

Integrated into his argument that the district court and court of appeals used the wrong removal standard is Lipschultz's assertion that amendments made in 2015 to the Minnesota Trust Code created a heightened standard that makes removal a drastic measure.[12]  He does not argue that the removal standard under section 501C.0706(b)(1) is ambiguous, but Lipschultz nevertheless reviews previous statutory versions of the Trust Code to allege that the Legislature enacted a stricter standard for removal in 2015.  In the absence of ambiguity, however, this court does not turn to canons of construction to interpret the removal provision.  *Spann v. Minneapolis City Council*, 979 N.W.2d 66, 73 (Minn. 2022) ("If the statute is unambiguous, our analysis ends, and we interpret the statute according to its plain meaning without resorting to the canons of statutory construction." (citation omitted) (internal quotation makes omitted)).

Further, nothing about the district court's order suggests that it assumed that removal would be proper in the absence of a serious violation.  In its order, the district court references the Restatement (Third) of Trusts, recognizing that "not every breach of trust warrants removal of the trustee, but serious or repeated misconduct . . . may justify removal."  Restatement (Third) of Trust § 37, cmt. e.  The district court also acknowledges that removal of a trustee is a "drastic action" that is not always appropriate.  The court's order shows that it fully appreciated the severity of removing a trustee and properly applied the statutory requirements to determine whether removal was appropriate.

---

[12]    The State moved to strike Lipschultz's argument that the 2015 amendments to the Minnesota Trust Code created a heightened removal standard, arguing that it was raised for the first time in his reply brief.  We deny the State's motion to strike.

For the foregoing reasons, we conclude that the district court and court of appeals applied the correct legal standard for removing a trustee.

## II.

Lipschultz next argues that the district court abused its discretion when it removed him under section 501C.0706(b)(1). A district court's decision to remove a trustee is reviewed on an abuse of discretion standard. *Will of Gershcow*, 261 N.W.2d at 338. "A district court abuses its discretion when its decision is based on an erroneous view of the law or is inconsistent with the facts in the record." *In re Pamela Andreas Stisser Grantor Tr.*, 818 N.W.2d 495, 508 (Minn. 2012). "[B]ecause the factfinder has the primary responsibility of determining the fact issues, and the advantage of observing the witnesses in view of all the circumstances surrounding the entire proceeding, an appellate court's duty is fully performed after it has fairly considered all the evidence and has determined that the evidence reasonably supports the decision." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 222 (Minn. 2021) (citation omitted) (internal quotation marks omitted). Considering the broad discretionary authority of district courts in determining when the removal of a trustee is appropriate, we conclude that the district court did not abuse its discretion here.

Trustees owe their beneficiaries certain fiduciary duties, such as the duty of loyalty and the duty of information. *See* Minn. Stat. sections 501C.0802 (2022), 501C.0813 (2022). "A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." Minn. Stat. § 501C.1001(a) (2022). Lipschultz asserts that that none of his actions were a serious breach of trust individually or even when considered cumulatively. As

19

mentioned, "[a] serious breach of trust may consist of a single act that causes significant harm or involves flagrant misconduct," or "a series of smaller breaches, none of which individually justify removal when considered alone, but which do so when considered together." Unif. Tr. Code § 706 cmt. The district court removed Lipschultz because his "repeated improprieties constitute[d] a serious breach of trust." The court of appeals affirmed: "Lipschultz engaged in a series of breaches that collectively constitute 'a serious breach of trust' under Minn. Stat. § 501C.0706(b)(1)." *Otto Bremer Tr.*, 984 N.W.2d at 902. Applying the same approach—considering Lipschultz's breaches as a series that cumulatively justify removal—we likewise affirm.

A.

The first in the series of breaches is Lipschultz's admitted self-dealing, his personal use of Trust resources. The duty of loyalty prohibits a trustee from putting their "own interests above those of the beneficiaries," Minn. Stat. § 501C.0802(a), and "no rule is more fully settled than that which forbids a trustee's dealing with himself in respect to trust property." *In re Anneke's Tr.*, 38 N.W.2d 177, 179 (Minn. 1949) (citation omitted) (internal quotation marks omitted). Consequently, when trustees have their own personal businesses, trust assets should not "be used in developing or furthering [a trustee's] business enterprises." *In re Janke's Est.*, 258 N.W. 311, 313 (Minn. 1935). The improper use of a trust's resources justifies removal: "If the trustee *appropriates trust property* to

20

the trustee's own use directly, the trustee should be removed." Susan Gary et al., *Bogert's the Law of Trusts and Trustees* § 527, 127 (3rd ed. 2019).[13]

Further, Minnesota law specifically prohibits trustees of a charitable trust from engaging in acts of self-dealing that could "give rise to liability for the tax imposed by" the IRS Code. Minn. Stat. § 501B.32, subd. 1(b) (2022); *see* Minn. Stat. § 501B.41, subd. 6 (2022) (providing that failure to administer a charitable trust property in accordance with law is a breach of trust). Here, Lipschultz's self-dealing not only could, but did, give rise to federal tax liability.

Lipschultz emphasizes the district court's statement that his self-dealing, "[i]n the larger scheme of things . . . may be 'de minimis.' " But there is no "de minimis defense" to whether self-dealing violates the duty of loyalty. To establish a breach for self-dealing, "no fraud, in fact, need be shown by the beneficiaries, and no excuse can be offered by the trustee to justify such transactions." *Anneke's Tr.*, 38 N.W.2d at 179-80 (citation omitted) (internal quotation marks omitted).

Even if the cost of Lipschultz's misuse was minor in comparison to the $2 billion value of the Trust, he still committed self-dealing, by his own words, "probably from the day [he] arrived at the Otto Bremer Trust" and engaged in behavior that exposed the Trust

---

[13] We acknowledge that Susan Gary is an author of *Bogert's the Law of Trusts* and was one of Lipschultz's expert witnesses, testifying that Lipschultz's self-dealing did not justify removal. Lipschultz criticizes the reliance of the district court and court of appeals on *Bogert's* because those courts cite to it but disagree with the opinions that the author gave at trial. The district court, however, did not need to accept all of Gary's opinions to rely on a treatise that she co-authored. *See Hous. & Redevelopment Auth. v. First Ave. Realty Co.*, 133 N.W.2d 645, 652 (1965) (stating that opinions of expert witnesses are only advisory, and the fact-finder may weigh such evidence and draw its own conclusions).

to IRS tax liability. From using his assistant—who was employed by the Trust—to accomplish personal, familial, and business-related tasks, to using the Trust's address for his own business, Lipschultz repeatedly placed his own priorities before those of the Trust. Based on the facts in the record, the district court acted within its discretion in finding, and the court of appeals properly affirmed, that Lipschultz committed a breach of trust by breaching the duty of loyalty and violating Minnesota law. Even if the district court would not have removed Lipschultz for this behavior alone, "it is a part of a concerning series of breaches" that may justify removal.[14]

B.

Perhaps the most concerning of Lipschultz's breaches of trust was his breach of the duty of loyalty when interacting with Junior Achievement, a Trust grantee. The duty of loyalty prohibits a trustee from placing "the trustee's own interests above those of the beneficiaries." Minn. Stat. § 501C.0802(a). The district court found that Lipschultz breached the duty of loyalty when he "misuse[d] grantmaking power to further his own personal objectives and resentment."

Lipschultz attempts to frame his interactions with Junior Achievement as a "dispute" and argues that Junior Achievement was not harmed by his actions. But it was not just a "dispute." As the district court found, "[a]t worst, his actions could be reasonably interpreted as threats against future grants because Junior Achievement was honoring [the

---

[14] Because we conclude that Lipschultz committed a series of breaches that cumulatively justify removal, we need not, and do not, reach the issue of whether the self-dealing or any of the other alleged breaches, standing on their own, are sufficient grounds for removal under Minn. Stat. § 501C.0706(b)(1).

Bank's] board chair. At best it was abusive treatment of a grantee for operational decisions unrelated to any legitimate charitable purpose of the Trust." And Lipschultz's conduct did harm Junior Achievement: it caused the organization to receive delayed funding during a critical time, return a $1.2 million grant, and sever its relationship with the Trust, which had previously been the organization's largest donor.

Lipschultz highlights the convenient timing of Junior Achievement's receipt of Paycheck Protection Program loans from Bremer Bank to imply that Bremer Bank is responsible for Junior Achievement's decision to return the grant money. But as the district court noted, "[r]egardless of the involvement of [Bank] executive Crain in the situation, the Court cannot shift responsibility for this egregious misconduct to anyone else." It was the responsibility of Lipschultz, and no one else, to conduct himself in accordance with the duties of a trustee of a well-respected charitable trust. Lipschultz failed to meet this standard when interacting with Junior Achievement.

Moreover, although Lipschultz's conduct specifically harmed Junior Achievement,[15] his conduct reflects a breach of the loyalty more broadly owed "to the accomplishment of purposes beneficial to the community," and for which the Attorney General is empowered to petition as the representative of the community. *See* Restatement (Second) of Trusts § 364 cmt. a (1959); *see also* Restatement (Third) of Trusts § 28 cmt. c (2003) (same); *see also* Minn. Stat. § 501C.0110(d) (2022) ("The attorney general of this

---

[15] The district court noted that Lipschultz displayed similar behavior with another grantee, Habitat for Humanity Twin Cities, but did not find that Lipschultz's actions harmed Habitat.

23

state has the rights of a qualified beneficiary with respect to a charitable trust having its principal place of administration in this state.").

The district court did not abuse its discretion when it based its removal of a trustee of a charitable trust on a breach of the duty of loyalty when the trustee used his position of power to intimidate a grantee on matters unrelated to any charitable purpose.

C.

We finally turn to Lipschultz's breach of the duty of information. Minnesota Statutes section 501C.0813(a) states that "[u]nless unreasonable under the circumstances, a trustee shall promptly respond to a beneficiary's request for information related to the administration of an irrevocable trust." Here, the Attorney General, who has the rights of a qualified beneficiary as to a charitable trust, *see* Minn. Stat .§ 501C.0110(d), and also has specific authority to conduct investigations and seek information, *see* Minn. Stat. § 501B.40, subd. 1 (2022), requested information regarding Lipschultz's successor's identity. Trustees must disclose "fully, frankly, and without reservation all facts pertaining to the trust," and the duty "does not end at the commencement of a legal proceeding." *In re Enger's Will*, 30 N.W.2d 694, 701 (Minn. 1948). "[C]hanges in the identities, number, or role of trustees" are circumstances requiring "proper disclosure" by a trustee. Restatement (Third) of Trust § 82 cmt. d (2007).

Lipschultz notes that trustees may choose not to comply with the duty of information when it is unreasonable under the circumstances and contends that delaying revealing the identity of his successor was reasonable—he feared that publicity would negatively impact the successor. The district court found that Lipschultz's reasons for not revealing his

successor's identity "are not valid reasons to be evasive about a topic that the [Attorney General's Office] has every right and reason to explore." We agree. Because Lipschultz was one of three trustees of a massive charitable trust, it was imperative for the Attorney General's Office to ascertain the identity of his named successor. Further, Lipschultz did not merely delay revealing his successor's identity but affirmatively lied about having a named successor. Accordingly, the court of appeals correctly concluded that the district court did not abuse its discretion when it found that Lipschultz breached the duty of information and considered this breach as part of a series of breaches justifying removal.[16]

### D.

In sum, the district court did not abuse its broad discretion when it determined that Lipschultz committed "a serious breach of trust" under section 501C.0706(b)(1), and the court of appeals did not err in affirming that decision. Lipschultz breached the duty of loyalty and the duty of information, demonstrating a pattern of placing his personal priorities over the duties he owed to the Trust. "[T]he determination of what constitutes sufficient grounds for the removal of a trustee is within the discretion of the [district] court." *Will of Gershcow*, 261 N.W.2d at 338. After carefully considering all the evidence, we determine that the record reasonably supports the decision to remove Lipschultz as a

---

[16] Because the foregoing breaches are sufficient to conclude that Lipschultz committed a serious breach through "a series of smaller breaches, none of which individually justify removal when considered alone, but which do so when considered together," we need not consider whether Lipschultz's alleged abusive behavior during the Trust's sale of Bank stock was a breach of trust. Unif. Tr. Code § 706 cmt.

trustee from the Otto Bremer Trust.  *See Civ. Commitment of Kenny*, 963 N.W.2d at 222.

Consequently, the district court did not abuse its discretion in doing so.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.


PROCACCINI, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.